PUGET SOUND PULP & TIMBER CO., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6465. Filed May 29, 1958.

*George H. Koster, Esq.*, for the petitioner.
*William J. Stetter, Esq.*, for the respondent.

The respondent disallowed petitioner's application for relief under section 722 of the Internal Revenue Code of 1939 and the related claims for a refund of excess profits tax for the calendar years 1940, 1941, and 1942 in the amounts of $265,966.38, $1,224,485.75, and $1,004,358.82.

In disallowing the said claims the respondent agreed that the petitioner had changed the character of its business during the base period, within the meaning of section 722 (b) (4), but determined that a fair and just amount representing normal earnings to be used as petitioner's constructive average base period net income, for the purposes of section 722, did not result in an excess profits credit as great as the credit based on invested capital. The questions for decision are (1) whether petitioner is also qualified for relief under sections 722 (b) (1) and 722 (b) (2), and (2) what is a fair and just amount to be used as petitioner's constructive average base period net income.

This proceeding was heard by a commissioner of the Court. Our findings of fact are based upon his findings, with such modifications,

additions, and changes as on the questions for decision and on the record appear justified, taking into account the exceptions of the parties.

### FINDINGS OF FACT.

Some of the facts have been stipulated.

Petitioner, a Delaware corporation, was organized on March 11, 1929, and has its principal office in Bellingham, Washington. During the period involved herein it was a manufacturer of unbleached sulphite wood pulp.

It keeps its books and files its income tax returns on an accrual method of accounting and by the calendar year.

Petitioner timely filed corporation income declared value excess-profits tax and excess profits tax returns for each of the years 1940, 1941, and 1942 with the collector of internal revenue for the district of Washington. The excess profits tax return for 1940 was filed on a consolidated basis with petitioner's wholly owned subsidiary, Puget Sound & Cascade Railway Company. Consolidated excess profits tax returns were not filed for the years 1941 and 1942.

Petitioner timely filed applications for relief under section 722, and for the refund of excess profits tax paid for each of the years 1940, 1941, and 1942, which claims the respondent denied.

Petitioner's excess profits tax liability for each of the years 1940, 1941, and 1942,[1] as determined by respondent without the application of section 722, is as follows:

| | |
|---|---|
| 1940 | $265, 966. 38 |
| 1941 | 1, 470, 441. 74 |
| 1942 | 1, 420, 776. 53 |

Petitioner's excess profits credit based on invested capital for each of the years 1940, 1941, and 1942, is as follows:

| | |
|---|---|
| 1940 | $616, 471. 36 |
| 1941 | 619, 152. 70 |
| 1942 | 658, 951. 18 |

The excess profits net income of petitioner and its wholly owned subsidiary, Puget Sound & Cascade Railway Company, as consolidated for the base period years, and computed under the provisions of sections 711 and 730 of the 1939 Code for the year 1940 without the application of section 722, is as follows:

| | Parent | Subsidiary | Consolidated |
|---|---|---|---|
| 1936 | $23, 001. 07 | ($5, 916. 54) | $17, 084. 53 |
| 1937 | 317, 700. 10 | 23, 599. 38 | 341, 299. 48 |
| 1938 | 23, 485. 60 | (10, 890. 53) | 12, 595. 07 |
| 1939 | 79, 529. 34 | (481. 07) | 79, 048. 27 |
| Aggregate | 443, 716. 11 | 6, 311. 24 | 450, 027. 35 |
| Average | 110, 929. 03 | 1, 577. 81 | 112, 506. 84 |

[1] The parties, by joint exhibit, are in agreement as to the payments of excess profits taxes for the years herein and the dates thereof.

Petitioner's excess profits net income for the base period years computed under section 711 for the years 1941 and 1942 without the application of section 722, is as follows:

| | |
|---|---|
| 1936 | $25,725.37 |
| 1937 | 367,555.69 |
| 1938 | 23,689.68 |
| 1939 | 97,217.70 |
| Aggregate | 514,188.44 |
| Average | 128,547.11 |

Petitioner was formed for the purpose of taking over as of March 31, 1929, the assets of three corporations and a syndicate. The three corporations were the Skagit Valley Lumber Company, Clear Lake, Washington; the Fidalgo Pulp Manufacturing Company, Anacortes, Washington; and the San Juan Pulp Manufacturing Company, Bellingham, Washington. The merging of the three corporations and the syndicate constituted a nontaxable reorganization under the Internal Revenue Code of 1939, and the bases of the assets in the hands of the petitioner were the same as they were in the hands of its predecessors. After its organization, petitioner's total assets were valued at $5,448,022.01. The syndicate was engaged in manufacturing pulp at Bellingham. The assets acquired from the syndicate were disposed of by petitioner in 1932.

The Skagit Valley Lumber Company had been organized on July 1, 1927, and shortly thereafter, had acquired certain assets of the Clear Lake Lumber Company, including all of the capital stock of the Puget Sound & Cascade Railway Company, of Clear Lake. These assets and capital stock were acquired by the petitioner at the time of its incorporation, from the Skagit Valley Lumber Company.

The Clear Lake Lumber Company had been organized on November 1, 1899, and was engaged in timber and mill operations at or near Clear Lake. Its properties consisted of a shingle mill, a sawmill, timber and timberlands, logging equipment, a water and light system and townsite, a general store, and related items. It had defaulted on its obligations to its bondholders in July 1925, and receivers were appointed in August of that year. The Skagit Valley Lumber Company was thereafter organized in behalf of the bondholders, and in a series of transactions extending from September 1927 to April 1928, acquired the bulk of the above-described assets. The receivership was not fully completed until 1931.

In 1936 petitioner sold the buildings, machinery, and equipment comprising its Clear Lake sawmill, and most of the lots in the townsite. The sale resulted in a capital loss of $708,063. The proceeds of the sale were used in the retirement of an obligation to the Reconstruction Finance Corporation. In 1938 petitioner sold the shingle

mill, together with miscellaneous equipment. In 1939 it sold a portion . of the logging equipment.

The Puget Sound & Cascade Railway Company had been organized on July 1, 1912, for the purpose of transporting lumber from Clear Lake to Mount Vernon, Washington. The line was subsequently extended up the Skagit River Valley to carry logs from timber holdings in that watershed to the mill at Clear Lake. The company was recognized as a common carrier by the United States Interstate Commerce Commission from 1917 until November 1939, when its application to abandon operations in interstate commerce was granted. A substantial part of the company's rails were removed in the summer of 1940, and operation was discontinued in August of that year.

The Fidalgo Pulp Manufacturing Company had been organized in December 1924, and took over the operation of an unbleached sulphite pulp mill constructed at Anacortes, about 70 miles north of Seattle. This mill was acquired by petitioner at the time of its organization. It was the first commercial pulp mill built on the Pacific coast, and was in the nature of an experimental unit for the conversion of box waste into pulp. The millsite consisted of approximately 12.5 acres. The mill covered approximately 4 acres, and was of all wood construction, built on piling on a fill. A considerable portion of the machinery and equipment had been secondhand when installed. The capacity of the mill prior to and during the base period was 80 tons of unbleached pulp per 24-hour day.[2] The mill had water shipment facilities at the Port of Anacortes, and a warehouse of approximately 3,000 tons' capacity available for storing pulp awaiting shipment was located on the dock. The mill was also served by the Great Northern Railway Company. Wood and steam requirements for the mill were furnished, and continued to be furnished, under contract by the Morrison Mill Company, which owned and operated an adjoining sawmill and box factory. When acquired, the mill had a valuation of $373,340.18. It was sold by petitioner on November 15, 1940, to the Scott Paper Company, of Chester, Pennsylvania, for $425,000.

The San Juan Pulp Manufacturing Company had been organized in January 1926, and took over the operation of an unbleached sulphite pulp mill constructed in that year at Bellingham, approximately 95 miles north of Seattle. The mill was similar to the mill at Anacortes, but had a capacity of 110 tons of unbleached sulphite pulp per 24-hour day. Its buildings occupied 5 acres of an 11-acre site. This mill was acquired by petitioner at the time of its organization and in the above transaction. For the shipment of its pulp by water,

---

[2] Unless otherwise specified, a ton means a short ton, 2,000 pounds.

the mill utilized the facilities of the Port of Bellingham. The mill was also served by the Great Northern Railway Company, the Northern Pacific Railway Company, and the Chicago, Milwaukee, St. Paul & Pacific Railway Company, the Great Northern having spur track connections to the mill. After its acquisition, petitioner carried the mill into its books at $761,334.55.

Wood pulp is the fibrous material obtained from wood by mechanical action or by the use of chemical solutions which free the cellulose fibers, which make up about 50 per cent of wood, from the nonfibrous substances. Five commercial processes are employed in making wood pulp. One is purely mechanical, and the pulp so made is known as mechanical pulp, or ground wood. Three of the processes are chemical, and the pulp resulting is sometimes referred to as chemical pulp. These three processes and the pulp resulting therefrom are known, according to the chemicals used, as sulphite, sulphate, commonly called kraft, and soda. The product produced by the fifth process is known as semichemical pulp.

Each of the five kinds of wood pulp has characteristics which render it more suitable than the others for conversion into certain products. Also, different species of wood are more generally used for the production of some kinds of pulp than for others.

Pulp may also be differentiated into bleached and unbleached. In the latter, the wood pulps contain some color as well as impurities, which render them unsuitable for the production of paper and other products in which a high degree of whiteness and cleanness is desired. Bleaching, which in itself is a chemical process, whitens and dissolves the impurities. Mechanical pulp, or ground wood, is seldom used alone but is mixed with other pulp, usually unbleached sulphite, for some of the cheaper papers and for board. It is used chiefly in newsprint paper, which is usually composed of 80 per cent ground wood and 20 per cent unbleached sulphite.

Sulphite pulp is produced chiefly from spruce, balsam fir, Western hemlock, and white fir, the sulphite process being best adapted to pulping long-fibered softwoods, which are nonresinous or low in resin content. It may be bleached or unbleached. Bleached sulphite is used in book paper, writing and bond, cover, wrapping, parchment, and tissue papers. A highly purified grade of bleached sulphite is used in the production of rayon and other synthetic textiles, and of transparent cellulose sheeting, and for chemical conversion into various compounds of cellulose. Unbleached sulphite is used in newsprint and other cheap printing paper, various types of board and linings, wrapping, tissues, and other paper in which pure whiteness is not essential.

One of the main distinctions between grades of unbleached sulphite pulp is that between strong and easy bleaching pulps. In general, less drastic cooking gives a greater yield of pulp per cord of wood, as well as a stronger pulp, but the pulp resulting from such cooking contains quantities of noncellulose material and is, therefore, difficult to bleach. More rigorous cooking results in a lower yield of weaker pulp, which may be more easily bleached. The object of the more severe cooking used in producing easy bleaching pulp is to eliminate more of the noncellulose parts of the wood, but the fiber may differ considerably in strength and other qualities, depending upon whether one or another method of increasing the severity of the cooking is employed.

The domestic industry recognizes five classes of unbleached sulphite pulp, which are generally used in designating particular lots of domestic pulp, but they are not susceptible of precise definition. Pulps produced by different mills and designated as one of these five grades do not necessarily conform exactly to the same standards. The five grades are Mitscherlich, easy bleaching, strong bleachable, strong unbleached, and news or board. The Mitscherlich pulp is used unbleached principally in high quality wrapping paper, and is particularly suitable for the production of greaseproof paper. Easy bleaching pulp is chemically pure, and commonly has greater whiteness before bleaching and discolors less with age than other grades of unbleached sulphite. Some easy bleaching pulp is used unbleached, but most of it is bleached either at the producing mill or at the paper mill. Strong bleachable has greater strength but not as good color, and may require a greater amount of bleaching agent to whiten it. Much strong bleachable is bleached, and when bleached, it is used largely for such papers as ledger and bond, in which strength as well as whiteness is desirable. Strong unbleached is the strongest grade of sulphite pulp produced by the quick-cook process. It contains a higher volume of impurities. Ordinarily it is not bleached but is converted into papers where strength rather than a closer approximation to pure whiteness is desired. News or board pulp is used principally with mechanically ground wood in the manufacture of newsprint, hanging, and similar papers, and with low-grade fibrous material, such as screenings and repulped wastepaper, in the manufacture of paperboard.

In addition to the five named grades, some pulp produced by a mill may not meet the minimum specifications for its standard quality and is classed as offgrade pulp. Such pulp is not usually produced intentionally and any one of the several grades referred to above may be produced in offgrade.

Pulp imported from Canada is graded in much the same way as that produced in the United States. But unbleached sulphite pulp imported from Europe is designated as easy bleaching or as strong unbleached, and with a further quality or grade distinction into prime, semiprime, and secunda. European easy bleaching is a grade of high quality pulp that is readily bleachable. Strong unbleached embraces all of the unbleached sulphite pulp imported from Europe, other than easy bleaching. European pulps are usually sold under brand names, and the pulps of different brands similarly designated as to grade differ considerably in color, cleanness, strength, and bleaching characteristics.

Sulphate, or kraft, pulp is produced chiefly from Southern pine and jack pine. The fibers are long and have unusual strength and flexibility. The pulp is brown in color, but more extensive cooking makes it easier to bleach. Unbleached sulphate pulp is used for making paper in which strength is the prime consideration and the brown color is not objectionable. In the base period years, bleached sulphate pulp was being produced only in relatively small quantities, since no economical method of bleaching such pulp without sacrificing its strength and flexibility had been perfected. But it was becoming of increasing importance because of its utilization in the manufacture of high-grade papers and its adaptability for blending with other kinds of pulp to increase the strength of certain grades of paper.

At and prior to the base period, practically the entire domestic output of sulphate pulp was converted into paper or board in plants which were integrated with the producing mills. This left substantial requirements of other consumers of sulphate pulp in this country to be supplied almost entirely by imports. The imports came principally from Europe. Substantial imports were received from Canada, but a large part of these imports represented shipments to domestic converting mills from Canadian affiliates. During the base period great expansion was going on in the capacity of the southern sulphate industries.

Soda pulp, a relatively minor pulp, is made chiefly from hardwoods, is practically all bleached, and is mixed with other pulp, principally bleached sulphite, in certain high grades of printing paper.

Semichemical pulp is produced only in small quantities, and is used in the production of corrugated board.

For commercial transportation of pulp or for storage, it is necessary to extract sufficient water to permit collecting the fibers into sheets dry enough to hold together in handling. The pulp may be wet laps, sheets or rolls, or dried and shredded. For lapped pulp, the pulp is passed through a wet machine or wet press, where, by pressure and

suction, it is concentrated to a desired consistency. It is then collected on a roller in several successive layers and compacted into a sheet, which the operator cuts from the roll and folds or laps. These laps may be loosely stacked for storage or shipment, or they may be compressed and baled. In the latter case, a greater percentage of the moisture is removed. Dried pulp is pulp from which nearly all water has been removed by a drying machine utilizing compression and heat. Pulp is usually dried on a machine similar to paper machines in which pulp is formed into a sheet and passed over numerous heated rollers which evaporate the moisture. As delivered from the machine, the pulp is in sheets of uniform size, or in a continuous roll. Some dried pulp is shredded and packed in bales. Such pulp passes through a wet press resembling that used for lapped pulp. It is delivered from the press in a continuous sheet which is shredded and macerated by revolving cutters. The macerated pulp is dried on a continuous moving wire or screen which carries it through a heated chamber or oven.

Pulp is measured, marketed, and invoiced on an air-dry basis. Air-dry means 90 per cent absolutely dry or oven-dry fiber and 10 per cent moisture. Pulp of that consistency is known as 100 per cent air-dry, but since the pulp is rarely dried to that precise condition, the shipping weight usually exceeds the air-dry weight for which the purchaser is invoiced. However, the moisture content can be reduced below 10 per cent, and it sometimes occurs that shipments are more than 100 per cent air-dry, in which case the shipping weights are less than the air-dry tonnage. Pulp in sheets or rolls, or shredded, and designated as dry pulp, may range as low as 80 per cent of air-dry. Lapped pulp, or wet laps, range from 35 to 45 per cent air-dry, or the laps may be compressed or baled to 60 to 65 per cent air-dry. European pulp shipped to the United States usually is approximately air-dry. The same is true of pulp shipped from the west coast of the United States. Canadian pulp is usually shipped with a greater moisture content. All over the world wood pulp is sold on an air-dry basis.

The producer of pulp in sheeted form normally enjoys certain advantages over the producer of pulp in shredded form. Sheeted pulp is usually cleaner than shredded pulp. In addition, the handling costs for sheeted pulp are less than for shredded pulp. In the case of sheeted pulp, there is greater uniformity in the size and weight of the bales, making it more susceptible of handling by normal or ordinary power-moving equipment. As a result, the handling of shredded pulp requires more hand labor on the part of the producer than of sheeted pulp. Similarly, more labor is required by papermakers in the preparation and handling of shredded pulp in the course of its conversion into finished products. By reason of these differences, shredded pulp

had a more limited market and, in this country at least, brought lower prices than sheeted pulp prices.

The wood-pulp producing and consuming industries in the United States are generally referred to in four divisions: Northeastern, Lake and Central, sometimes called Midwestern, Southern, and Pacific Coast. Sulphite pulp is the principal pulp produced in the Northeastern, Lake and Central, and Pacific Coast regions, and sulphate in the Southern region. At the beginning of the base period, the timber supplies of the Northeastern and Lake and Central regions had long been subject to heavy drains, and the readily accessible supplies of wood pulp had been greatly depleted. In contrast, the South had large stands of timber, principally Southern pine, while on the Pacific Coast there were large stands of hemlock and white fir, and aside from wood cut specifically for pulp, a considerable volume of pulpwood had been supplied from sawmill waste.

The mills producing pulp in the United States are classified generally as integrated and nonintegrated mills. Integrated mills produce the pulp and, in the same plant, or in other plants operated by the same companies, press it into paper and market the paper. Nonintegrated mills produce only the pulp and then sell it to the manufacturers or processors. During the base period years the only nonintegrated mills in this country that produced unbleached sulphite pulp for the open market only were located on the Pacific coast and included petitioner's mills at Anacortes and Bellingham. In 1935 the west coast mills had accounted for over two-thirds of the total sales of unbleached sulphite pulp by United States mills. The major portion of the unbleached sulphite pulp produced by mills in the Northeastern and Lake and Central regions had gone to integrated or affiliated converting mills.

The combination of pulp production and conversion permits the pulp to be used without first being lapped or dried, thereby eliminating operations which involve considerable expense, but which operations are necessary for economical transportation when the pulp is transferred to separate converting mills. The economy of integration is particularly great in the production of those kinds of paper which are made in large runs of uniform specifications from one or two kinds and grades of wood pulp. For example, newsprint, coarse wrapping paper, and kraft board. Very little of these "mass production" commodities is made except in integrated mills. In the production of many other kinds of paper and board, however, of which the volume of output is smaller or the pulp composition more varied, or which are made largely from other materials mixed with new wood pulp, the

advantages of integration are less marked. They may in fact be more than offset by other considerations, especially when the paper or board is marketed in areas distant from those in which the pulp originates. The advantages of proximity of paper mills to their markets, or to the sources of the other materials used with wood pulp, notably waste-paper, tend to maintain the separation of pulp and certain paper or board production. The generally higher costs of transportation on paper than on pulp also affect the advantages of integrated operations, as compared with nonintegrated.

Differences in the advantages to be gained through integration in the production of various kinds of paper, and differences in the geographical distribution of the production of the several kinds of pulp, are reflected in the different proportions of the domestic production of the various kinds shipped as pulp from the producing mills. A much larger part of the domestic production of sulphite than of other kinds of wood pulp is shipped in the form of pulp. Even in the case of sulphite pulp, however, much the greater part of the output of the Northeastern and Lake and Central regions, which produce much less than their requirements, is converted in integrated pulp paper establishments. In the Pacific Coast region, where far more sulphite pulp is produced than is required for the regional paper consumption, a very substantial part of the production, at the base period, possibly as much as two-thirds, but in case of unbleached less than one-half, was shipped as pulp from the producing mills. And though a considerable part of the pulp so shipped went abroad and another part went to domestic rayon and chemical plants, a considerable quantity was shipped to eastern paper mills. This was due to the fact that sulphite pulp was used in many papers in which the advantages of combining the converting with the pulping processes were at a minimum, and also because, on the long haul from the Pacific coast to the large eastern markets, the higher transportation rates on paper restrict the shipment of the surplus in that form.

Paper and board mills without pulp-producing plants were located principally in the Northeastern and Lake and Central regions, and produced, for the most part, such papers as writing, the finer printing and wrapping, tissue, and specialty papers, and boards made largely of wastepaper or materials other than new wood pulp. These paper and board mills used large quantities of wood pulp, principally sulphite and sulphate, but even the considerable amounts of sulphite pulp shipped to these converters by nonintegrated domestic pulp producers were small, relative to their demand. Hence, the bulk of the sulphite

pulp, as well as of sulphate and mechanical pulp, used by paper and board mills that did not obtain their pulp from integrated pulp plants was imported.

The principal sources of imported pulps prior to World War II were Sweden, Canada, and Finland, Sweden alone being the source of over two-thirds of the pulp imported. These three countries, plus Germany and Norway, supplied about 97 per cent of the total United States imports. Over 90 per cent of the unbleached sulphite pulp imports from Europe in 1935 were of the strong unbleached grade, mainly prime quality. The remainder was easy bleaching, principally of prime quality. These imports were consumed chiefly in the Northeastern and Lake and Central regions of the United States.

Canadian pulp imported into the United States consisted in part of intracompany transfers between Canadian pulp mills and affiliated United States consuming mills and in part of pulp sold in open-market transactions. In 1931, 1933, and 1935, about 65 per cent of the total sulphite pulp from Canada was purchased, and 35 per cent consisted of intracompany transfers. Excluding rayon pulp, all of which was disposed of in the open market, the sulphite pulp for paper manufacture consisted of about 55 per cent open-market sales and 45 per cent intracompany transfers. Most of the Canadian unbleached sulphite pulp entering the United States market was of news or board grade, much of it in lapped form. Some was considered of prime strong grade, but the quantity was relatively small.

The proportions of the United States consumption of the several kinds of wood pulp supplied by imports differed because of (a) the presence or absence of duties on the papers into which they entered; (b) the relative abundance or scarcity of, and the consequent price differences in, the pulpwoods from which they were chiefly made; and (c) the relative advantages of integration of pulp and paper manufacture for different kinds of pulp. Most of the paper into which sulphite and sulphate pulp entered was dutiable, a fact which favored the importation of the pulp over the importation of the paper. The ratio of imports to consumption was lower for sulphate than for sulphite pulp. Suitable pulpwoods for producing the former were more abundant and cheaper in this country, and for the commoner forms of brown paper and board, in which sulphate pulp is used, there are greater advantages in the integration of the pulp and paper processes. The high ratio of imports to consumption of sulphite pulp is partly explained by the wide variety of papers into which sulphite pulp entered, and by the fact that the output of many such papers was

relatively small, so that the advantages of integration of pulp and paper manufacture were minimized. Further, sulphite pulp was made in a greater range of types and grades than any other pulp, and some consumers had preferences for certain foreign types and grades.

Unbleached sulphite pulp imports, in tons, for the years 1922 to 1939, and the countries from which the imports came, were as follows:

| Year | Total imports | Austria | Czecho-slo-vakia | Estonia | Fin-land | Ger-many | Lithu-ania | Nor-way | Sweden | Canada | All other |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1922 | 473,424 | 52 | 2,598 | -------- | 30,959 | 19,004 | -------- | 32,630 | 222,004 | 164,293 | 1,884 |
| 1923 | 517,275 | 794 | 2,946 | -------- | 65,634 | 47,993 | -------- | 23,768 | 178,153 | 187,852 | 10,135 |
| 1924 | 629,351 | 84 | 7,153 | -------- | 53,768 | 61,537 | 169 | 29,209 | 254,215 | 215,386 | 7.830 |
| 1925 | 648,798 | 1,746 | 6,830 | -------- | 54,876 | 48,005 | 2,953 | 23,116 | 216,198 | 284,110 | 10,964 |
| 1926 | 704,394 | 3,232 | 8,326 | -------- | 69,220 | 60,822 | 2,778 | 20,847 | 274,316 | 253,291 | 11,562 |
| 1927 | 687,518 | 4,071 | 7,377 | 864 | 78,519 | 28,545 | 2,816 | 19,877 | 335,860 | 201,186 | 8,403 |
| 1928 | 717,539 | 758 | 1,849 | 10,937 | 103,911 | 26,806 | 2,653 | 26,271 | 332,786 | 201,321 | 10,248 |
| 1929 | 785,631 | 224 | 1,449 | 4,500 | 122,216 | 18,841 | 5,928 | 20,524 | 392,170 | 213,433 | 6,346 |
| 1930 | 744,855 | -------- | 3,403 | 2,428 | 111,845 | 21,330 | 2,781 | 22,631 | 382,159 | 190,838 | 7,440 |
| 1931 | 604,807 | -------- | 2,630 | 9,244 | 109,163 | 24,877 | 4,116 | 11,419 | 336,764 | 99,236 | 7,358 |
| 1932 | 569,059 | -------- | 4,193 | 13,658 | 107,989 | 47,410 | 1,144 | 35,170 | 293,367 | 63,095 | 3,033 |
| 1933 | 720,163 | 118 | 9,183 | 15,534 | 133,524 | 49,162 | 7,085 | 29,845 | 389,294 | 85,721 | 697 |
| 1934 | 675,603 | -------- | 4,982 | 11,654 | 126,069 | 52,997 | 9,859 | 25,233 | 352,894 | 90,571 | 1,344 |
| 1935 | 693,026 | 449 | 4,614 | 15,509 | 146,166 | 50,024 | 5,976 | 16,539 | 377,320 | 75,029 | 1,400 |
| 1936 | 786,720 | 1,846 | 12,752 | 15,163 | 157,324 | 39,871 | 14,905 | 25,391 | 425,753 | 88,272 | 5,443 |
| 1937 | 919,680 | 3,149 | 19,287 | 17,551 | 123,112 | 32,740 | 19,833 | 28,479 | 539,488 | 128,535 | 7,506 |
| 1938 | 686,252 | 95 | 12,245 | 25,604 | 117,167 | 32,917 | 10,536 | 4,892 | 392,211 | 86,505 | 4,080 |
| 1939 | 661,193 | -------- | 2,516 | 23,952 | 115,844 | 12,440 | 2,292 | 14,145 | 374,003 | 110,144 | 5,857 |

Unbleached sulphite pulp production in the United States for consumption in integrated mills, and production for sale on the open market, including exports, in tons, for alternating years of 1925 through 1935, were as follows:

| Disposition | 1925 | 1927 | 1929 | 1931 | 1933 | 1935 |
|------|------|------|------|------|------|------|
| For consumption | 727,207 | 790,081 | 685,990 | 529,599 | 454,076 | 483,256 |
| For sale | 63,303 | 92,330 | 162,764 | 147,112 | 147,026 | 151,691 |
| Total | 790,510 | 872,411 | 848,754 | 676,711 | 601,102 | 634,947 |
| Per cent for sale | 8.01 | 10.58 | 19.18 | 21.73 | 24.46 | 23.89 |

The unbleached sulphite pulp produced in the United States for consumption in integrated mills, and produced for sale on the open market, including amounts exported, in tons, for the base period years, were as follows:

| Disposition | 1936 | 1937 | 1938 | 1939 |
|------|------|------|------|------|
| For consumption | 546,034 | 610,447 | 490,793 | 641,515 |
| For sale | 147,869 | 181,028 | 111,062 | 187,688 |
| Total | 693,903 | 791,575 | 601,855 | 729,203 |
| Per cent for sale | 31.3 | 22.9 | 18.6 | 25.6 |

The unbleached sulphite pulp capacity for all of the United States' mills, the production of all of the United States mills, the capacity of all of the Pacific coast mills, the production of all of the Pacific coast mills, the capacity of all of the nonintegrated mills, and the production of all of the nonintegrated mills, all of which were Pacific coast mills, in tons, for the years 1936, 1937, 1938, and 1939, were as follows:

| All mills integrated and nonintegrated [1] | | | | |
|---|---|---|---|---|
| | 1936 | 1937 | 1938 | 1939 |
| United States capacity_____ | 1,001,896 | 991,464 | 1,045,139 | 987,039 |
| United States production_____ | 693,903 | 791,575 | 601,855 | 729,203 |
| Production as a per cent of capacity_____ | 69 | 80 | 58 | 74 |

| All Pacific coast mills integrated and nonintegrated [1] | | | | |
|---|---|---|---|---|
| Pacific coast capacity_____ | 358,415 | 393,130 | 444,890 | 465,675 |
| Pacific coast production_____ | 300,149 | 355,113 | 248,336 | 348,422 |
| Pacific coast production as per cent of capacity_____ | 84 | 90 | 56 | 75 |

| All nonintegrated mills [1] | | | | |
|---|---|---|---|---|
| United States capacity_____ | 160,515 | 190,705 | 216,185 | 231,620 |
| United States production_____ | 147,869 | 181,028 | 111,062 | 187,688 |
| Production as a per cent of capacity_____ | 92 | 95 | 51 | 81 |

[1] The capacity and production for integrated and nonintegrated pulp mills for the years 1936 through 1939, as shown above, were computed by the United States Pulp Producers Association, Inc., from data collected by it from the pulp-producing companies themselves. During the years stated the pulp mills had regularly reported the daily capacity of their mills to the said Pulp Producers Association, but until requested to do so, in 1941, they did not make reports as to the number of days in the year their pulp mills "would be operated under 'normal full operating schedule' and under 'forced-draft emergency operation.'" To arrive at the annual capacity for 1936 through 1939, the daily capacity as previously reported for each such year was multiplied by the number of "normal" operating days as reported in 1941. For the United States as a whole, the average "normal" for unbleached sulphite as reported in 1941 was 330 days. We find nothing of record, however, to indicate that the 1941 reports of the various mills as to the number of days their mills would be operated under a "normal full operating schedule" and "forced-draft emergency operation" were intended to reflect, or did reflect, the capacity of their mills except as they existed in 1941.

The petitioner in its report to the said association reported that both its "normal" and its "forced-draft" operating schedule was 360 days per year, and in making the above computations, the said association compiled petitioner's capacity for the years 1936-1939 on the basis of its reported daily capacity multiplied by 360 days. Certainly as to petitioner, this report of 360 days per year must have had reference to 1941, the year of reporting, since, as hereafter shown, 360 days could not possibly have been a "normal" operating schedule for 1938 or the first nine months of 1939, and the facts do not support 360 days as "normal" for 1936 and 1937, assuming the existence of the new Bellingham mill during those years, regardless of whether 360 days would have been reasonable for a "forced-draft" operation in those years. For other west coast mills, annual capacity was computed on the basis of the "normal" reported by them, which varied from 309 days to 360 days. The average number of days per year constituting the "normal full operating schedule" for the Pacific coast mills and for the nonintegrated mills for the purpose of arriving at the above capacity figures for the base period years does not appear. There is no showing of record, however, as to what the daily capacity previously reported by petitioner and the other Pacific coast mills and used by the association in its computations above was.

In its computations of capacity, the association did not use the figures of actual days the mills operated, since capacity was "considered to be what mills could produce under normal conditions," not what they did produce.

The comparatively low ratio of production to capacity for "All Mills" could, to some extent, have been due to greater proportions of unutilized capacity in the Northeastern and Lake and Central regions. These mills on the average were considerably older than those on the Pacific coast. Many such mills were integrated with plants designed for production of newsprint and found it difficult to compete with Canadian newsprint. The depletion of local wood supplies was also a factor affecting the operations of the mills in those regions.

United States capacity, production, imports, exports, domestic sales, and total apparent consumption, in tons, of unbleached sulphite pulp for the years 1922 to 1940, were as follows:

| Year | Capacity | Production | Imports | Exports | Domestic sales United States pulp mills | Apparent consumption |
|---|---|---|---|---|---|---|
| 1922 | | 841,421 | 473,424 | | | |
| 1923 | | 853,381 | 517,275 | | | |
| 1924 | | 830,271 | 629,350 | | | |
| 1925 | | 790,510 | 648,798 | | | |
| 1926 | | 911,729 | 704,394 | 17,000 | | 1,599,000 |
| 1927 | | 872,411 | 687,519 | | | |
| 1928 | | 836,751 | 717,539 | | | |
| 1929 | | 848,754 | 785,631 | 38,000 | | 1,597,000 |
| 1930 | | 815,897 | 744,855 | 35,000 | | 1,526,000 |
| 1931 | | 676,711 | 604,807 | 30,000 | | 1,252,000 |
| 1932 | | 548,702 | 569,058 | 19,000 | | 1,099,000 |
| 1933 | | 601,102 | 720,162 | 14,000 | | 1,307,000 |
| 1934 | | 631,763 | 675,491 | 58,000 | | 1,250,000 |
| 1935 | 999,595 | 634,947 | 693,026 | 72,000 | 82,048 | 1,258,903 |
| 1936 | 947,868 | 693,903 | 786,720 | 68,043 | 98,811 | 1,412,580 |
| 1937 | 937,998 | 791,575 | 919,680 | 105,016 | 134,669 | 1,606,239 |
| 1938 | 988,779 | 601,855 | 686,252 | 33,976 | 124,000 | 1,254,131 |
| 1939 | 987,039 | 729,203 | 661,193 | 40,915 | 207,084 | 1,349,481 |
| 1940 | 1,130,619 | 995,700 | 373,390 | 72,290 | 355,000 | 1,296,800 |

In buying pulp, consumers do not depend entirely upon grade designations. Papermakers and other users decide on the suitability of the different grades of pulp produced by different mills for conversion into particular products on the basis of experience. The pulp designated as of a particular grade by one pulp mill may be preferred by a given papermaker to pulp similarly designated by another producer. As a result of such preferences, the competition between mills does not necessarily result in identical prices for pulp similarly designated as to grade.

Where, however, the pulps of any grade designation produced by different mills are recognized as of equal quality, there has ordinarily been a close approach to uniformity in their prices at a given point of delivery. Since there are instances of variations in the quality of pulp similarly described as to grade by different mills, however, and differences in grade designations as between pulp imported from Europe and domestic and Canadian pulp, comparisons of prices of pulp from different sources cannot always be made with confidence that they represent pulps of closely similar quality. There were, nevertheless, certain categories of sulphite pulp between which approximately the same price differentials appeared from one time to another, at least whenever the market had been fairly stable for some time.

The unbleached sulphite pulp imported from Europe could be classified fairly definitely as to characteristics and relative quality. However, in the case of pulp described as prime strong unbleached, of which about three-quarters of the unbleached sulphite pulp imported from Europe during the base period years had consisted, there were three groups of mill brands which brought considerably different

prices. The three groups may be referred to as higher than standard, standard, and substandard. The higher than standard brands brought prices usually about $1.20 per ton higher, and the substandard brands about $2.20 per ton lower, than the standard brands. It was impossible to determine the extent to which these differentials reflected imperfections of price competition and the extent to which they were the normal results of differences in quality. But the persistence of the price differentials was some indication that there were some distinctions in quality. Prime easy bleaching pulp was the most expensive grade of unbleached sulphite pulp imported from Europe, and brought prices usually $3 per ton higher than prime strong unbleached of the standard group of brands. Semiprime strong unbleached pulp of the standard group was usually priced $1.20 to $1.80 per ton lower than the prime pulp of such brands. The small quantities of unbleached sulphite pulp described as secunda were priced substantially lower than the semiprime pulp of similar characteristics.

As a practical matter, producers of wood pulp do not carry substantial inventories of their finished product. Factors contributing to this practice are the cost of carrying the pulp, the storage space necessary for keeping it, and the deterioration of the pulp while in storage. Shredded pulp, particularly when it contains substantial moisture, will sour. As a consequence, the producers, in order to keep the mills in operation, seek orders in advance of production.

Contracts under which European pulp was marketed prior to and at the beginning of the base period ran from 1 or 2 months up to 5 years, most of them having a life of from 6 months to 2 years. On the other hand, few contracts for future delivery of domestic and Canadian pulp at definite prices extended beyond 6 months; but agreements or contracts were made for deliveries up to a year, without establishing prices for the full life of the agreement.

The price of pulp was usually established under three types of contracts: (1) Fixed price contracts; (2) maximum price contracts; and (3) quarterly adjustable contracts.

Under a fixed price contract, the sale would have a stated price for delivery of a specified tonnage of pulp at or within a definite time. While such price was supposed to be binding upon both buyer and seller, that is, the buyer was to be protected against a rise and the seller against a fall in the market, an adjustment usually resulted, after a fall in the price of the pulp, by the making of a new contract at the lower price but for a larger amount of pulp and extending over a longer period of time.

Under a maximum price contract, a specified amount of pulp was to be delivered at a certain time at the prevailing market price, but not more than the maximum price stated in the contract. This contract was more beneficial to the buyer than to the seller, but it permitted

the seller to get business when in need of it and to keep the pulp mill in operation.

The quarterly adjustable contract provided for the delivery of a definite amount of pulp at a specified time at a price that would be determined by the prevailing market price during each quarter of the calendar year. It was the normal practice to adjust the price before the end of the month preceding each calendar quarter, fixing the contract for the succeeding quarter at the prevailing market price of that month. The use of quarterly adjustable contracts was a common practice.

As a general rule, the base price at which producers marketed their pulp in the United States was the price the pulp delivered on the dock at Atlantic ports would sell for, and the price at which a particular grade or brand of pulp was contracted for was generally uniform for all Atlantic ports, except for minor variations due to different docking and handling charges at particular ports. This was particularly true of European pulp and pulp from Pacific coast mills, both American and Canadian, shipped by water to the eastern part of the United States. Such selling price of pulp delivered on the dock at an Atlantic port was commonly referred to as the ex-dock or on-dock price.

In the case of pulp purchased by mills located inland, the price paid by such purchasing mills was usually the Atlantic coast ex-dock or on-dock price, plus the freight from the Atlantic port of entry to the purchasing mill. In other words, the price usually paid by an inland purchaser was the competitive price at the Atlantic port of entry for the grade or brand of pulp purchased, plus the cost of transporting it from the port of entry to its inland destination.

It was petitioner's general practice to price its pulp for sale in the manner above described, although much or most of the pulp sold by it to purchasers located in the central or middle western area was shipped by rail directly overland. If, however, in the case of pulp so shipped, there was a variance between the freight actually paid and what would have been the freight by water to an Atlantic port of entry and back by rail to the middle western purchaser and the freight which was in fact paid was favorable to petitioner, petitioner would strive to take advantage of such favorable rate, so as to obtain the resulting better margin of profit on its pulp. On the other hand, it was necessary at times to make price concessions and grant freight allowances in order to meet competitive conditions and obtain business.

As general business began to evidence signs of recovery from the low ebb of the depression, and an increasing interest in buying began to be shown, the consumers of sulphite pulp, desiring to prolong the low costs therefor, put considerable pressure upon European producers to contract for rather extended periods at the then existing low price levels. American and Canadian mills were still following a practice

which had started under World War I conditions, namely, that of quoting their pulp on a quarterly price basis, although actually booking tonnage on the basis of a customer's requirements from month to month. The differences in these selling methods resulted in keeping pulp prices comparatively low after general commodity prices had started upward. During 1936, however, the demand became such that the domestic mills, being unhampered for the most part by long-term contracts, were in position to raise their prices, but due to the fact that their customers still had sizable quantities of foreign pulp to come in on favorably priced contracts, the price increases under domestic contracts were retarded in some degree.

By the end of 1936, practically all consumers had contracted for their 1937 requirements of both foreign and domestic pulp, purchases having been made in most cases on the basis of 100 per cent of the buyer's anticipated 1937 operations. Meanwhile, the world demand for pulp had been greatly augmented by the great development of the nonpaper uses for sulphite pulp.

Under these conditions, early in 1937 buyers began contracting for 1938 on the basis of an expected consumption in excess of their then operating rate. Most foreign pulp was still coming in at figures lower than the spot market, although sizable tonnages were being sold at high prices, and the quarterly price adjustments of the American mills were readily made at increasing figures. Foreign sellers also found themselves able to make spot sales and forward contracts at increasingly high figures, and by midsummer much higher prices prevailed, prices which were far ahead of any corresponding increase in paper prices or anything justified by increased wood or labor costs. Consumers contracted for pulp on a large scale, covering not only prospective requirements for 1938, "but even as far ahead as into 1939."

Toward the close of the third quarter of 1937 a change came over the market. "The bottom sort of dropped out, or rather the boom ended and prices started to decline." Buyers of pulp withdrew from the market and demand slacked off substantially. October and November were decidedly quiet for the pulp market, and resellers of pulp appeared. Requests for postponements of shipments were received in increasing numbers. During the final month of the year the recession was at its worst. There were few, if any, buyers, and efforts to resell grew pressing. The entire outlook was changed overnight, and what had been a seller's market had become a buyer's market. Heavy inventories at consuming mills and large stocks of foreign and domestic pulp at the ports pressed upon the market. The consumers, while recognizing their obligations under foreign contracts calling for specified monthly tonnages, undertook to absorb their commitments, but in doing so, were obliged to fall back on their requirements clause in their domestic contracts.

The domestic producers, after contacting producers abroad with a view to the downward adjustment of quotations, in keeping with the reversal in the consumption position, announced a sharp reduction in contract bases for the first quarter of 1938 for both bleached and unbleached sulphite pulp ex-dock American Atlantic seaboard. Throughout the summer of 1938, the pulp situation was in a constant flux, and by August the foreign prices had declined to such an extent that it was necessary for American producers to make a further reduction in their prices. Summed up, the market for pulp in 1938 was quite bad, and in the early part of 1939 the selling of pulp "wasn't easy."

It had become evident that foreign pulp producers were "marrying" or "converting" the pulp contracts they had with consuming mills in the United States. The contracts between the foreign producers and the American paper mills were not as flexible either as to price or tonnage as were those between American pulp mills and the same buying mills. It was easier to cancel or defer the American contracts. Because of the flexibility of their contracts, the American pulp producers felt the full effect of the first curtailment of production by the consuming mills.

The practice of "marrying" contracts was applied with probably a majority of paper mills that could not use during 1938 the pulp contracted for from abroad. The arrangements would vary, but essentially the "marrying" consisted of an agreement by the foreign pulp producer not to insist on fulfillment of the 1938 contract at the higher prices, contracts made in 1937 for 1938 delivery, providing the buyer would agree to take an additional tonnage, usually an equal amount, in 1939. The American buyer either would be relieved immediately of the high price on the pulp he could use in 1938 by agreeing to a normal price for 1939 tonnage, or he could pay the high contract price for the pulp he took in 1938 and receive a sufficiently low price on the 1939 tonnage and average out the prices for the 2 years. In this manner, the foreign contracts were kept in effect, and "there wasn't much business left over for the domestic pulp mills." Many of the buyers of pulp were so "tied up" by the foreign contracts they could not buy their usual proportion from American pulp mills, and the price of pulp in the United States was determined, in the main, by prices being paid the foreign producers.

The foreign mills also had an advantage over American pulp producers in lower ocean freight rates and lower European labor costs. In addition, the depreciated currencies of European countries enabled the pulp producers of those countries to undersell the domestic producers of this country without cutting their prices in terms of their own currencies.

The domestic producers were of the view that there was a subsidized dumping of foreign pulp in the United States market, in violation of the Act of May 27, 1921, known as the Anti-Dumping Act. They filed complaints with the Treasury Department in 1939, seeking relief in the form of a compensating tariff on the duty-free pulp. Dumping means selling at prices which give the foreign manufacturer a net return less than that received in his own home market. It could also mean selling below the cost of production. The foreign manufacturer might receive a subsidy or bonus from his government, and thereby be enabled to dump his products in the American market.

In November 1939, the Secretary of the Treasury issued a statement to the collectors of customs, appraisers of merchandise, and others concerned, in which he stated: "After investigation and careful consideration of the evidence presented, I have reached the conclusion that findings of dumping with respect to wood pulp imported from foreign countries are not justified."

The growth of tension in Europe and the ultimate outbreak of the European war in September of 1939 caused the paper mills to turn to domestic producers for pulp, and the downward trend in pulp prices that had started in the latter part of 1937 stopped.

The general increase in the physical volume of industrial production in the United States from August to December 1939, together with the increase in the physical volume of production of sulphite pulp, pulp, and paper and pulp, based upon a 1935–1939 average of 100, were as follows:

|  | August 1939 | December 1939 |
| --- | --- | --- |
| Industrial production | 106 | 124 |
| Sulphite pulp production | 99 | 134 |
| Pulp production | 109 | 142 |
| Paper and pulp production | 109 | 133 |

Prior to the 1930's the pulp producers in the United States had had relatively little export trade, but after 1931 there was a considerable expansion of such trade. As the export trade developed, it consisted chiefly of sulphite pulp, which from 1933 to 1936, made up approximately 97 per cent of the total. Japan was by far the principal export market. The export trade in sulphite pulp to Japan, and to a lesser extent to other countries, had been closely related to the development of the pulp industry in the Pacific Coast region, and more particularly to the development of the production of rayon grade pulp in that area. About nine-tenths of the total sulphite pulp exported, and practically all of such pulp going to Japan, was shipped by west coast mills.

With respect to transportation costs to the far eastern markets, the Pacific coast mills probably had an advantage over European

mills. They did have an advantage over mills in the eastern part of the United States. Regardless of that fact, however, very little pulp produced by the latter mills was available for export to the Far East, since most of the pulp produced by those mills which was available for sale in the open market was more advantageously disposed of in the large pulp markets in the eastern part of the United States.

Except for the period from 1930 through February of 1934, during which, first as owner and then as lessee, it operated a bleached sulphite pulp mill at Everett, Washington, petitioner at all times pertinent herein limited its wood pulp operations to the production of unbleached sulphite pulp at its Bellingham and Anacortes mills.

Both the Anacortes mill and the Bellingham mill produced their pulp in shredded form, whereas American pulp converters had a preference for sheeted pulp. As a consequence, petitioner, from the beginning, experienced some difficulty in selling its shredded pulp on the domestic market, and when it did make sales, it sold at prices some lower than those which could have been obtained if the pulp had been in sheeted form. To counteract that situation, and as early as September of 1929, it sent a representative to Japan, in an effort to secure Japanese business. The representative had been connected with the San Juan Pulp Manufacturing Company, and had made a trip to Japan in 1926 for a similar purpose, which resulted in some sales in 1927. On his 1929 trip, he obtained some orders for petitioner's pulp, and made arrangements with the Nichizui Trading Company, Ltd., sometimes referred to as Nichizui, to act as petitioner's Japanese distributor.

Japan was a country of limited natural wealth, but having a large and rapidly growing population, it did have a large supply of cheap labor, which it utilized in its processing and manufacturing of goods for export. The most noteworthy raw product was silk, and silk, whether raw or finished, was the dominant item in its export trade. Much, if not most, of the raw materials required for the other goods produced had to be imported, the most important of these being cotton, for processing into textiles. The raw cotton was purchased largely from the United States, with smaller amounts from Egypt and India. The United States, in turn, was Japan's best customer, and its purchases accounted for 40 to 45 per cent of the total Japanese exports. There again, silk was the dominant item.

For a considerable period following World War I, Japan had had an expanding and what appeared to be a prosperous economy, but by the late 1920's or early 1930's, conditions were not so favorable. Its total trade showed an increasing import balance, which was being met largely by the shipping of capital. It lost most of its silk trade, possibly due in a substantial degree to the development of synthetic fibers. Also, there was a growing hostility to the low-priced Japanese

goods, made possible by the abundance of cheap labor, one of the most notable items affected being cotton textiles. This situation was worsened by the Japanese invasion of Manchuria in 1931. China had been Japan's second important market, and after the Manchurian invasion, there was some boycotting of Japanese goods by the Chinese. An increase in the resistance to the importation of Japanese goods in other nations also resulted.

There had already been some production of rayon in Japan, and one of the steps taken to improve her condition was to develop a rayon trade to make up for the loss in silk. The raw material for the production of rayon is wood pulp, but the Japanese production of the highly purified, bleached sulphite pulp suitable for conversion into rayon was comparatively quite small. The manufacture of pulp for paper had been a household industry in Japan for centuries, and in the period beginning with World War I the production of wood pulp in Japan had attained substantial commercial significance. Even so, some considerable portion of its wood pulp requirements was being met by imports because of increasing demands in the paper industry. There were extensive forests suitable for pulp in one or more of the northern islands, however, and by increasing its own production of pulp, Japan would not only be satisfying its pulp requirements in rayon and paper production but it would be doing so with its own raw materials. And in the early 1930's, steps began to be taken to increase Japanese wood pulp production to that end.

Whether in the end Japan would be able to meet her pulp requirements through her own production, her current needs exceeded her current production, and she began importing increasing quantities of pulp for both rayon and paper production. Beginning with 1931, and up through 1936, her imports of sulphite pulp from the United States increased substantially, such imports for 1931 being 24,261 tons and for 1936, 163,604 tons. Of the 163,604 tons imported in 1936, 102,684 tons were bleached sulphite pulp, as against 60,920 tons of unbleached sulphite.

It was in this atmosphere that petitioner was able to build up its Japanese sales of pulp from its Bellingham and Anacortes mills. In 1932 it sold 3,355 tons of its pulp to Japan; in 1933, 12,163 tons; in 1934, 30,592 tons; in 1935, 30,509 tons; and in 1936, 30,128 tons, and the tonnage sold in 1936 was approximately half of the entire exports of unbleached sulphite pulp from the United States to Japan in that year. These Japanese sales also accounted for approximately half of petitioner's entire pulp output.

The Japanese mills liked petitioner's pulp, and it became a well-known pulp in Japan for papermaking. Due to its large supply of cheap labor, the labor-saving advantage of sheeted pulp over shredded pulp, in the course of its paper production, was not the important

factor in Japan that it was in the United States. And further, some if not all of the Japanese mills using petitioner's pulp installed special equipment or machinery for handling shredded pulp. Practically all of the pulp sold by petitioner in Japan was easy bleaching.

In the interim, there had been a steady buildup by Japan of its own pulp production, but increased consumption had more than offset the increases in production, and up to and including 1937 the quantity of pulp imported was in increasing amounts. By 1936, rayon production had been expanded to the extent that Japan had gained world leadership, which leadership it "maintained by a one per cent margin over the production of the United States." The production of staple fiber, also from rayon quality pulp and a favorite substitute for wool and cotton and good for mixing with silk, wool, or cotton, had expanded even more rapidly. As a consequence, Japanese pulp imports, which had been 114,186 tons in 1932, increased steadily up to and through 1937, when a peak of 522,608 tons was reached.

Knowledge in the United States of the Japanese pulp, paper, rayon, and related industries had been fragmentary, and at times contradictory, and in order to keep the American producers of wood pulp advised as to Japanese production and consumption and policies and trends related thereto, the United States Department of Commerce, through its representative in Japan, endeavored to assemble accurate information of a background and reference nature, in addition to current statistical data, to the end that the American producers might be informed and be able to adjust their own policies, when necessary, on the basis of accurate information. In furtherance of that objective, reports covering the information so assembled were regularly published in the magazine Pacific Pulp & Paper Industry, and though the date of the beginning of these reports is not shown, they did regularly appear in the issues of the magazine during the base period. From time to time, these reports carried information outlining steps being taken to increase the Japanese production of wood pulp, and there was ample indication that Japan was planning and striving for pulp production on a self-sufficiency basis.

In building up its own production of wood pulp, Japan did not limit itself to the home islands, but instituted and promoted pulp-producing operations in Formosa, Korea, and Manchuria. It also purchased timber tracts in Canada. It had been obtaining pulp from Korea as early as 1930, in which year Korean production was 15,928 tons. From 1930 through 1936, Korean production ranged from a low of the 15,928 tons produced in 1930 to a high of 20,180 tons for 1934, and was 19,980 tons for 1936. Following 1936, however, Korean production jumped to 42,340 tons in 1937, 45,229 tons in 1938, and 48,875 tons in 1939. As to Formosa, no data is available prior to 1938, when it produced 5,767 tons. In 1939 Formosan production

increased to 22,195 tons. Whether Japan had pulp available from Manchuria prior to 1938, does not appear, but in 1938, 17,102 long tons of Manchurian pulp was received, of which 12,720 were rayon pulp and 4,382 were paper pulp. In 1939 the quantity of Manchurian pulp received was 48,395 long tons, of which 17,832 were for paper and 30,563 for rayon. During the same period there was also a steady buildup of pulp production by Japan in the home islands, with the result that total Japanese pulp production, which had been 617,253 tons in 1932, increased to 898,872 tons in 1936, 993,414 tons in 1937, 1,069,857 tons in 1938, and 1,180,132 tons in 1939. These totals include production from Korea and Formosa, but the production from Manchuria for those years was in addition thereto.

Japan's imports of wood pulp, which, as stated above, had reached a peak of 522,608 tons in 1937, dropped off drastically thereafter, and were 161,035 tons in 1938 and 187,499 tons in 1939.

During the early 1930's Japan had been able, to some degree, to overcome or offset the disadvantages which might have been expected from its unfavorable trade balance. This was accomplished, in the main, by an increase in exports made possible through a national policy of industrial expansion, which, in turn, had been aided by an accumulation of raw materials purchased at low prices.[3] In 1931, however, it had abandoned the gold standard and was experiencing serious problems in exchange, brought about by a flight of capital which the gold embargo of December 13, 1931, and the Capital Flight Prevention Law of July 1, 1932, had been ineffective in stopping. The result was the passage, in 1933, of the Exchange Control Law, permitting the establishing of an exchange control system, and even though the controls exercised under the law were fairly moderate, it seemed that they were effective for a time in accomplishing the end to which they were directed.

During 1936 Japan was again losing in its efforts to maintain a satisfactory trade balance. The excess of imports over exports for the year stood at 291,872,000 yen at August 10, 1936, and this situation was only partially relieved during the latter part of the year, which was regarded as the export season and was generally looked to for an excess of exports as a means of reducing the adverse balance built up during the first part of the year.

As 1936 drew to a close, various factors, including the huge budget under discussion, the uncertain international situation, the continued rise in the national debt, and certain prospective changes in the tariff, combined to weaken the yen. This, in turn, reacted unfavorably on the exchange rate, and the Government took steps to strengthen exchange controls. The changes were effected through Ordinance No. 1

[3] There was actually a favorable balance in merchandise items in 1935, for the first time since 1918.

of January 8, 1937, which introduced the requirement that permission of the Ministry of Finance be obtained for securing the exchange with which to pay for imports of merchandise over a certain minimum amount. This was the beginning of the transition from exchange control proper to exchange control as a form of trade control. Originally, however, it was regarded as temporary and was to be enforced only until July 31 of 1937.

By an ordinance of July 7, 1937, the controls established under Ordinance No. 1 were extended "for the time being." The "China Affair" had begun on the same date, with the "Lukowkaio Incident." In the meantime, the surplus of 1937 imports over 1937 exports had been building up, and at August 10 stood at 744,134,000 yen, and instead of being reduced thereafter by the usually expected excess of exports, the unfavorable balance had grown by September 10, 1937, to 786,000,000 yen.

During the month of September 1937, at an emergency session of the Diet, Law No. 92, referred to as the Law Concerning Temporary Measures for Exports and Imports, was passed. According to article 1 of that law, the Government might, when "deemed necessary to secure the movement of the national economy as a result of the China Affair, prohibit or restrict exports or imports of goods in accordance with the provisions" thereof. Enforcement was by an ordinance of the Department of Commerce and Industry, issued October 11, 1937. This ordinance restricted imports of some goods, prohibited imports of some goods, and prohibited exports of some goods. It set up a dual control in the Ministry of Commerce and Industry and the Ministry of Finance. Permits for imports had to be obtained from these two ministries. By these steps, the law of January 8, 1937, requiring permission for obtaining exchange for the payment of imports, had become permanent, and the amounts per month for which permission was not required had been reduced progressively from 30,000 yen to 100 yen. Importers were required to secure the necessary exchange permits before goods could be imported, and the granting or refusal of such permits provided a convenient method for the control of the kinds and quantities of goods imported.

Beginning with the "Manchurian Incident" in September of 1931, Japanese military policies had complicated Japan's economic picture, and in the years which followed their influence became more noticeable. Under the 1937 ordinance, the goods most favored for importation were goods having to do with the armed services and the raw materials best suited for processing into commodities which could be sold abroad, so as to improve the foreign trade picture and increase Japanese buying power. The import of most items was, for all practical purposes, prohibited.

Nichizui advised petitioner early in 1937 of the import control system which the Japanese Government had set up. It was Nichizui's practice to purchase petitioner's pulp for its own account, but only after it had received corresponding orders for pulp from Japanese mills. Licenses for allocation and importation of the pulp were at first issued with some regularity, but by autumn, the issuance of licenses was being postponed and at the end of the year few, if any, were being issued. Under date of June 25, 1938, a communication was addressed to the members of the Japan Paper Pulp Importers' Association, by the Vice-Chief of the Provisional Material Adjustment Bureau, Ministry of Commerce and Industry, to the effect that the ministry had been giving consideration to the importation of paper pulp, "and that in view of the general monetary exchange situation the importation of paper pulp already contracted for is no more permitted." Prior to that time, petitioner's last shipment of pulp to Japan had been in November of 1937.

As compared with the export of 30,128 tons of its pulp to Japan in 1936, petitioner's Japanese sales for 1937 dropped to 23,966 tons. It made no sales in 1938. It sold 3,433 tons in 1939, and 5,887 tons in 1940.

Although the volume of petitioner's 1937 sales in Japan was not quite 80 per cent of its 1936 sales in that country, 1937 was the year in which Japan imported its greatest quantities of both paper pulp and rayon pulp. Its total importations of paper pulp were 197,218 tons for 1937, as compared with 176,244 tons for 1936. But for whatever reason, the total imports from the United States in 1937 were, as in the case of the petitioner, less than those for 1936, the imports from the United States being 74,416 tons for 1936, as compared with 55,198 tons in 1937. In contrast, the Japanese imports of paper pulp from Sweden were 50,748 tons in 1936 and 92,293 tons in 1937. And while petitioner made no sales of pulp in Japan in 1938, the sales made in Japan in that year by other United States producers amounted to 9,967 tons and Japan had a total of imports of paper pulp for that year of 33,261 tons. In 1938 Sweden again was the largest exporter of paper pulp to Japan. In 1939 Japan imported a total of 29,942 tons of paper pulp, of which 6,162 tons were from the United States and more than half of that amount was petitioner's pulp. In contrast, the United States was the largest single exporter of rayon pulp to Japan for all of the years from 1935 through 1939. Its greatest year was 1937, when the sales amounted to 154,800 tons, as compared with 97,770 tons in 1936, 47,727 tons in 1938, and 49,061 tons in 1939.

At the same time petitioner was undertaking to develop a market for its pulp in Japan, it was also selling pulp in China. Its Chinese sales ranged from 1,037 tons in 1932 to 53 tons in 1933, 2,148 tons in

1934, 2,778 tons in 1935, 4,814 tons in 1936, and 2,496 tons in 1937. Petitioner's factor for China was located in Shanghai, which was taken by the Japanese military forces shortly after the invasion of China began on July 7, 1937. In March of 1938, the factor reported to petitioner that the paper mills in and around Shanghai were either destroyed by shells and bombs, or were being used by the Japanese as military depots. These mill owners were unable to receive and petitioner was unable to deliver the pulp that had been ordered and the outstanding contracts covering such pulp were considered canceled. As a result, petitioner's pulp exports to China dropped to 508 tons in 1938, 613 tons in 1939, and 509 tons in 1940.

The following schedule shows the orders for petitioner's pulp from Japanese and Chinese customers, in respect of which cancellations were made, the dates of the orders, the quantities thereof, the contract or averaged price per ton, the cancellations by tons, the gross dollars of contracts canceled, and the year delivery was to have been made as specified in the orders:

### Japanese

| Order No. | Date of order | Tons ordered | Contract price per ton (or averaged) | Tons canceled | Gross selling price canceled | Year for delivery |
|---|---|---|---|---|---|---|
| 53 | 4/10/37 | 8,400 | $50.00 | 7,785 | $389,250.00 | 1937 |
| 45 | 10/ 6/36 | 5,936 | 50.00 | 934 | 46,700.00 | 1937 |
| 64 | 5/21/37 | 8,400 | 75.00 | 8,400 | 630,000.00 | 1938 |
| 67 | 7/ /37 | 8,400 | 77.00 | 8,400 | 646,800.00 | 1938 |
| 63 | 5/10/37 | 1,568 | 57.81 | 1,568 | 90,646.08 | 1937 |
| 38 | 8/10/36 | 1,120 | 57.81 | 1,120 | 64,747.20 | 1938 |
| 62 | 5/10/37 | 8,400 | 57.81 | 8,400 | 485,604.00 | 1938 |
| 62 | 5/10/37 | 8,400 | 73.50 | 8,400 | 617,400.00 | 1938 |
| 56 | 5/10/37 | 750 | 69.15 | 750 | 51,862.50 | 1937 |
| 56 | 5/10/37 | 370 | 69.15 | 370 | 25,585.50 | 1938 |
| 57 | 5/10/37 | 2,520 | 69.15 | 2,520 | 174,258.00 | 1937 |
| 58 | 5/10/37 | 745 | 70.30 | 745 | 52,373.50 | 1937 |
| 58 | 5/10/37 | 375 | 70.30 | 375 | 26,362.50 | 1938 |
| 59 | 5/10/37 | 2,016 | 70.30 | 2,016 | 141,724.80 | 1938 |
| 40 | 11/28/36 | 1,120 | 59.00 | 177 | 10,443.00 | 1937 |
| 61 | 5/10/37 | 745 | 59.00 | 745 | 43,955.00 | 1937 |
| 61 | 5/10/37 | 375 | 59.00 | 375 | 22,125.00 | 1938 |
| 60 | 5/10/37 | 2,240 | 75.00 | 2,240 | 168,000.00 | 1938 |
| 65 | 7/ 2/37 | 1,680 | 75.00 | 1,680 | 126,000.00 | 1938 |
| Totals | | 63,560 | | 57,000 | 3,813,837.08 | |
| Totals 1937 | | 21,784 | | 15,224 | 859,488.08 | |
| Totals 1938 | | 41,776 | | 41,776 | 2,954,349.00 | |

### Chinese

| Order No. | Date of order | Tons ordered | Contract price per ton (or averaged) | Tons canceled | Gross selling price canceled | Year for delivery |
|---|---|---|---|---|---|---|
| 5826 | 7/28/37 | 2,688 | $75.00 | 2,688 | $201,600.00 | 1938 |
| Several | | 4,569 | 48.03 | 3,812 | 183,090.36 | 1937 |
| Totals | | 7,257 | | 6,500 | 384,690.36 | |

### Japanese and Chinese

| Order No. | Date of order | Tons ordered | Contract price per ton (or averaged) | Tons canceled | Gross selling price canceled | Year for delivery |
|---|---|---|---|---|---|---|
| Grand: | | | | | | |
| Totals | | 70,817 | | 63,500 | $4,198,527.44 | |
| Totals 1937 | | 26,353 | | 19,036 | 1,042,578.44 | |
| Totals 1938 | | 44,464 | | 44,464 | 3,155,949.00 | |

After operating 22½ days in December 1937, the Anacortes mill was shut down. This was occasioned by the failure of petitioner's Japanese customers to procure the required import licenses for the latter part of 1937. The Anacortes mill remained closed throughout 1938, and until late in 1939, as shown hereafter.

Trade barriers or restraints are as old as international trade. They are imposed for various reasons: For the protection of health, safety, and morals, or to protect domestic producers from competition with foreign producers of similar goods. They may be imposed to protect the entire economy of a country. They are a regular hazard of foreign trade, and one engaging in international trade takes risks with respect thereto which it does not have in domestic trade.

Japanese total productions of sulphite, sulphate, soda, and mechanical pulps, total imports of rayon and paper pulps, total rayon and paper pulp imports from the United States, and total imports from petitioner, in tons, for the years 1935 through 1939, were as follows:

| | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|
| *Pulp production*[1] | | | | | |
| Sulphite: | | | | | |
| Rayon | 37,447 | 61,834 | 64,169 | 115,755 | 175,920 |
| Paper | 406,006 | 404,864 | 445,175 | 453,443 | 431,364 |
| Sulphate | 45,366 | 58,036 | 71,099 | 70,847 | 79,836 |
| Soda | | | | 3,099 | 37,082 |
| Mechanical | 359,554 | 374,138 | 412,971 | 426,713 | 455,930 |
| Total production | 848,373 | 898,872 | 993,414 | 1,069,857 | 1,180,132 |
| *Pulp imports* | | | | | |
| Rayon | 141,479 | 189,405 | 325,390 | 127,774 | 157,557 |
| Paper | 160,760 | 176,244 | 197,218 | 33,261 | 29,942 |
| Total imports | 302,239 | 365,649 | 522,608 | 161,035 | 187,499 |
| *Imports from United States* | | | | | |
| Rayon | 61,238 | 97,770 | 154,800 | 47,727 | 49,061 |
| Paper | 60,859 | 74,416 | 55,891 | 9,967 | 6,162 |
| Total United States imports | 122,097 | 172,186 | 210,691 | 57,694 | 55,223 |
| *Imports from—* | | | | | |
| Petitioner | 30,509 | 30,128 | 23,966 | | 3,433 |

[1] Includes production in Japan proper, Karafuto, Korea, and Formosa, but not Manchuria. The latter may, however, be included above as imports.

Total United States exports of sulphite pulp, total exported to Japan, total bleached sulphite pulp exported, total unbleached sulphite pulp exported, total exports of unbleached sulphite pulp by petitioner, total United States exports of unbleached sulphite pulp to Japan and to China, and petitioner's exports of unbleached sulphite pulp to Japan and to China, in tons, for the years 1931 to 1943, were as follows:

| Year | Total United States exports of bleached and unbleached sulphite pulp | Total United States exports to Japan of bleached and unbleached sulphite pulp | Total United States exports of bleached sulphite pulp | Total United States exports of unbleached sulphite pulp | Total exports of unbleached sulphite pulp by petitioner | Total United States exports to Japan of unbleached sulphite pulp | Total United States exports to China of unbleached sulphite pulp | Exports to Japan by petitioner | Exports to China by petitioner |
|---|---|---|---|---|---|---|---|---|---|
| 1931 | 49,792 | 24,261 | 22,000 | 30,000 | (1) | -------- | -------- | (1) | (1) |
| 1932 | 45,857 | 23,701 | 28,000 | 19,000 | 7,091 | (1) | (1) | 3,355 | 1,037 |
| 1933 | 77,165 | 50,419 | 64,000 | 14,000 | 13,847 | (1) | (1) | 12,163 | 53 |
| 1934 | 139,270 | 102,397 | 84,000 | 58,000 | 37,611 | (1) | (1) | 30,592 | 2,148 |
| 1935 | 166,433 | 134,123 | 98,000 | 72,000 | 37,123 | (1) | (1) | 30,509 | 2,778 |
| 1936 | 187,571 | 163,604 | 119,528 | 68,043 | 36,744 | 60,920 | 5,072 | 30,128 | 4,814 |
| 1937 | 312,605 | 125,226 | 207,589 | 105,016 | 29,474 | 60,221 | 4,611 | 23,966 | 2,496 |
| 1938 | 124,238 | 61,291 | 90,262 | 33,976 | 16,003 | 1,035 | 508 | -------- | 508 |
| 1939 | 112,390 | 31,251 | 71,475 | 40,915 | 18,297 | 3,992 | 633 | 3,433 | 613 |
| 1940 | 289,505 | 89,556 | 217,215 | 72,290 | 39,832 | 8,113 | 1,654 | 5,887 | 509 |
| 1941 | 190,529 | 19,363 | 112,542 | 77,987 | (1) | 1,455 | -------- | (1) | (1) |
| 1942 | 205,413 | -------- | 107,007 | 98,406 | (1) | -------- | -------- | (1) | (1) |
| 1943 | 157,566 | -------- | 67,875 | 89,691 | (1) | -------- | -------- | (1) | (1) |

[1] Not shown.

Petitioner's production of unbleached sulphite pulp at Anacortes, at Bellingham, total production, total domestic sales, foreign sales to Japan, India, China, United Kingdom, other foreign sales, total foreign sales, and total sales, in tons, for the years 1932 to 1940, were as follows:

| Year | Production | | | Total domestic sales | Foreign sales | | | | | | Total sales |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Anacortes | Bellingham | Total | | Japan | India | China | United Kingdom | Other foreign sales | Total foreign sales | |
| 1932 | -------- | 28,528 | 28,528 | 22,835 | 3,355 | 1,801 | 1,037 | -------- | 898 | 7,091 | 29,926 |
| 1933 | 8,998 | 33,479 | 42,477 | 20,056 | 12,163 | 1,161 | 53 | 470 | -------- | 13,847 | 42,903 |
| 1934 | 22,377 | 32,899 | 55,276 | 17,575 | 30,592 | 3,959 | 2,148 | 878 | 34 | 37,611 | 55,186 |
| 1935 | 20,487 | 33,915 | 54,402 | 16,264 | 30,509 | 3,461 | 2,778 | -------- | 375 | 37,123 | 53,387 |
| 1936 | 25,730 | 37,298 | 63,028 | 24,972 | 30,128 | 1,732 | 4,814 | 70 | -------- | 36,744 | 61,716 |
| 1937 | 25,096 | 38,281 | 63,377 | 30,010 | 23,966 | 3,012 | 2,496 | -------- | -------- | 29,474 | 59,484 |
| 1938 | -------- | 47,682 | 47,682 | 34,439 | -------- | 4,726 | 508 | 9,957 | 812 | 16,003 | 50,422 |
| 1939 | 6,839 | 87,577 | 94,416 | 78,174 | 3,433 | 2,272 | 613 | 5,761 | 6,218 | 18,297 | 96,471 |
| 1940 | [1]27,297 | 100,839 | 128,136 | 87,106 | 5,887 | 1,347 | 509 | 17,294 | 14,795 | 39,832 | 126,938 |

[1] Mill sold in November 1940.

Late in 1936 or early in 1937, petitioner decided to increase its productive capacity for sulphite pulp by the construction of a new mill at Bellingham, and for that purpose acquired approximately 12 additional acres of land adjacent to the existing mill. Plans for the new plant were made in the spring of 1937, the piling was driven in August, and construction of the mill began in the fall. The mill was to be financed out of the net proceeds from the sale of 125,000 shares of preferred stock and, to the extent necessary, the proceeds from the sale of 45,500 shares of common stock.

Preparatory to the offering of the preferred and common stock, petitioner filed a registration statement with the Securities and Exchange Commission on August 13, 1937, and under date of September 3, 1937, a prospectus was issued covering the offering of the said securities.

According to the stated plans, the new mill was to be of steel, brick, and concrete construction, and was to have an estimated annual production capacity of 40,000 tons of pulp. It was to have a deepwater frontage on Bellingham harbor of approximately 1,500 feet. The equipment was to consist of a boiler plant, an acid plant, a chipping plant, three digesters, each of 17,000 tons capacity, screening, washing, blending, and storage equipment, and one Fourdrinier dryer and one Chemipulp process accumulator. The plans also included the purchase of an additional Fourdrinier dryer, to be installed in the new drying building, but which was to be used in connection with the operations of the existing mill. Upon installation of this dryer, the building housing "the four drying machines of the present mill" was to be converted into a warehouse, with an estimated capacity of 4,000 tons of pulp. The mill was so planned that it could be expanded into a larger mill if that should become desirable.

The petitioner, according to the prospectus, had accepted orders for sale during 1937 and 1938 of more than 80,000 tons of pulp in the aggregate to buyers in the Orient, principally in Japan. It took note of newspaper reports indicating a state of hostilities between Japan and China, "leading possibly to a formal declaration of war in the future between the two countries which might materially adversely affect the Company's sales in both countries." It further stated that petitioner was "of the opinion that the entire amount of its sales commitments to Japan and China could be resold in the United States and European and other foreign markets at prices at least as high as those called for by the Chinese and Japanese commitments in the event that hostilities, embargoes, restrictions on exports, or blockades would prevent deliveries of such commitments to Japan and China, and that accordingly its general business would not be adversely affected by loss of its Far Eastern markets."

The original plans called for completion of the new mill by March of 1938. It was actually completed and ready for operation in May of 1938, but was not placed in operation during May and June, and was not in full operation until August 1 of that year.

According to the prospectus, the original estimate of cost of the new mill was $2,283,257, but it was the view of a consulting engineer that actual cost would be between $2,500,000 and $2,600,000. As completed, it represented an investment on the part of the petitioner of approximately $2,700,000.

The additional cost, at least to some extent, was due to changes in the design and certain additions not originally contemplated. It was decided that the acid plant should be large enough to produce acid sufficient both for the new mill and the old and to allow for a possible future expansion in production. The additional equipment for the acid plant as constructed "cost in the neighborhood of $90,000."

Whether it represented a change in design or an addition to original plans, provision was made in constructing the mill for the installation, later on, of forced circulation of the acid in the three digesters. This installation was completed in 1939, and was used in the latter part of that year.

As completed, the new mill at Bellingham was modern, up to date, and soundly built. Its equipment was of the latest design. An important feature was the use of corrosion-resistant materials. Another was the installation of automatic controls, wherever they would operate to an advantage. The pulp thereafter produced was in sheeted form, and new and effective equipment was installed for baling and handling the pulp produced. The efficiency of the installation in its operation promoted savings both with respect to the labor and supplies and to the materials necessary to the production of pulp.[4]

The original mill at Bellingham was abandoned or otherwise disposed of in 1937 and 1938, with the exception of the digesters and screen room equipment, which were incorporated into the new plant.[5]

At a special meeting of its board of directors held on September 11, 1939, petitioner's president advised the board that due to the large demand for unbleached sulphite pulp, brought on by war conditions in Europe, it would be to petitioner's advantage to rehabilitate the Anacortes plant and place it in operation as soon as possible, and by vote of the directors, he was authorized to take the steps necessary to accomplish that end. The president also reported that it would be possible to increase the output of the Bellingham plant by approximately 25 tons per day, but that the "present capacity" of the dryers was insufficient to take care of such production. He was authorized to proceed with the enlargement of or addition to the dryers, provided the cost would not exceed $15,000.

---

[4] A detailed description of the new mill as completed appeared in an article in the July 1938 issue of the Pacific Pulp & Paper Industry magazine, which article was prepared with the assistance of engineers who designed it, petitioner's superintendent Ekholm, chief chemist Ericsson, and plant engineer Skoog. According to the article, the capacity of the new plant was 125 tons per day, that of the old plant 110 tons per day, and with the mill at Anacortes had "a combined producing capacity of approximately 100,000 tons annually"; the capacity of the two Fourdrinier dryers was 125 tons per day each; the new acid plant was capable of producing acid for a 250 ton per day mill; the screening building was designed to accommodate equipment for producing 250 tons of pulp per day; only two boiler units were installed, but the boiler building was such that a third could be added. A sawmill on adjoining property, which had been purchased in 1936 or 1937, was or had been revamped to break down the logs into cants for chipping, and the new chipping plant was designed and constructed to make the chips for the "old mill" as well as the new "mill"; a new laboratory was located midway between the new mill and the old mill, and the dock as completed was sufficiently large to accommodate two ocean freighters at one time.

[5] These facts are as shown by written stipulation of the parties. It is to be noted, however, that in his report dated January 28, 1939, covering petitioner's operations for 1938, L. Turcotte, then petitioner's secretary and treasurer, later its president, stated that the Bellingham Division operated 10 months in 1938, being shut down in May and June; that from "August onwards the old and new units were in full operation"; that production amounted to 47,682 tons, and that the total production possible for Bellingham and Anacortes for the year would have been 84,000 tons. "Therefore the pulp plants operated at approximately 57 per cent of full capacity."

Production at the Anacortes plant was resumed in October of 1939, and from the date of resumption of operations, until the end of 1939, it operated 83 days and produced 6,839 tons of pulp.

According to the minutes of a special meeting of petitioner's board of directors held on December 11, 1939, the question was brought up as to the sufficiency of the boiler capacity of the Bellingham plant "in view of the considerable increase in daily production over that anticipated when the plant was originally built, and information was conveyed to the Board that in all probability the company would have to install an additional boiler to relieve the strain on the present two boilers which are running to full capacity at all times." Petitioner's president "stated that after the Christmas shutdown and check-up of the boilers the company would be in a better position to make a final decision of the matter of the purchase of an additional boiler."

Further additions to the new mill were made subsequent to the base period.[6] The major additions to the mill made in 1940 were as follows:

| | | |
|---|---|---|
| New boilers | [1] $77,598.28 | January to July. |
| New screens | 26,007.40 | July to December. |
| SO₂ recovery system | 15,937.95 | April to December. |
| New acid tanks | 2,883.58 | July. |
| New heat exchanger | 5,800.00 | September. |
| Miscellaneous | 12,866.33 | All 1940. |

[1] Approved by Directors January 22, 1940 as follows:
"Mr. Anderson [petitioner's president] reported that after inspection of the boilers after the Christmas shutdown, it was decided an additional boiler was necessary if the plant was to continue producing at the present rate of production as the boilers were being operated considerably over capacity with resulting heavy repair expenses, and therefore he had placed an order for an additional boiler at a cost of $75,574.00."

When the pulp industry was first established in the Pacific Northwest it was not too important for a pulp manufacturer to have its own timber since waste wood from sawmills was available for use. At the time it was acquired by petitioner, the Anacortes mill was obtaining its wood from the Morrison Mill Company, which owned and operated a sawmill and a box factory on adjacent property. But by the beginning of the base period, the supply of waste wood had disappeared, necessitating the use of other raw material. At Bellingham, petitioner first relied on "farm wood" or cordwood for its raw material. The supply of such wood did not continue to be sufficient and logs were used. Petitioner having acquired at the time of its organization substantial timber holdings which had belonged to the Clear Lake Lumber Company, thereafter satisfied its pulpwood

---

[6] This fact is as stipulated by the parties, and the facts as to the 1940 items installed and the cost thereof are from a joint exhibit. The SO₂ recovery system, shown above as having been installed "April to December," was a new system invented in 1939, according to the oral testimony of Ekholm. In contradiction of the joint exhibit, it was his testimony that the installation of the system began in the fall of 1939, and was put into operation in April of 1940. It is not understood that the installation of the recovery system tended to increase the capacity or output of the mill, but through the recovery of sulphur from gases, it was a cost-saving device. There is, however, some evidence indicating that the purposes of its installation was to relieve the city of Bellingham of sulphur fumes which had theretofore been released into the air.

requirements partially from its own logging operations and partially from the purchases of pulpwood, logs, and slabs in the open market. Logs cut in petitioner's logging operations were either used by petitioner for pulpwood, if of a suitable species, or sold on the market for lumber or other purposes. Petitioner conducted its logging operations at a loss.[7]

Petitioner's log production, the logs purchased by the Bellingham mill on the open market, the logs acquired by the Bellingham mill from petitioner's logging operations, the total of all logs acquired by Bellingham, and corresponding figures of logs purchased on the open market, the logs acquired from petitioner's logging operations, and the total of all logs acquired by the Anacortes mill, all being stated in board feet, for the years 1936, 1937, 1938, and 1939, were as follows:

|  | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Log production: [1] |  |  |  |  |
| Fir | 24, 176, 000 | 18, 921, 120 | 1, 310, 410 | 4, 521, 060 |
| Cedar | 6, 552, 000 | 3, 160, 560 | 658, 090 | 1, 379, 940 |
| Hemlock and white fir | 12, 587, 000 | 23, 404, 710 | 3, 609, 380 | 10, 505, 840 |
| Pine | 307, 000 | 179, 660 | 29, 860 | 25, 840 |
| Larch |  | 1, 665, 140 | 310, 620 | 1, 003, 370 |
| Total | 43, 622, 000 | 47, 331, 190 | 5, 918, 360 | 17, 436, 050 |
| Bellingham mill: |  |  |  |  |
| Purchased on open market | 11, 362, 003 | 13, 222, 235 | 35, 261, 131 | 69, 973, 925 |
| From petitioner's logging operations [1] | 5, 762, 360 | 11, 589, 730 | 5, 983, 070 | 6, 783, 770 |
| Total | 17, 124, 363 | 24, 811, 965 | 41, 244, 201 | 76, 757, 695 |
| Anacortes mill: |  |  |  |  |
| Purchased on open market | 18, 905, 000 | 14, 902, 960 |  | 1, 676, 622 |
| From petitioner's logging operations [1] | 6, 825, 000 | 10, 193, 040 |  | 5, 342, 120 |
| Total | 25, 730, 000 | 25, 096, 000 |  | 7, 018, 744 |

[1] There is no breakdown by varieties of the said log production as between those used by petitioner in the production of sulphite pulp in its Bellingham and Anacortes mills and those sold on the open market for processing into lumber or other products. There is indication that hemlock and white fir are the varieties generally used in the production of sulphite pulp, and it does appear that larch logs were also used. It is stated on the joint exhibit, from which the above figures were taken, however, that in 1936 only hemlock was used by petitioner in its pulp-producing operations, and with respect to the years 1938 and 1939, it is apparent that even the combined quantities of hemlock, white fir, and larch produced by Clear Lake in those years were not sufficient to supply the pulpwood shown as acquired by the Bellingham and Anacortes mills in those years from petitioner's own log production. Possibly the differences were made up from the pine and fir production, although, according to the record, pine and Douglas fir are used for the production of sulphate, not sulphite, pulp. We have found nothing of record to indicate that cedar is used in the production of pulp.

[7] With respect to petitioner's logging operations as related to its pulp operations, the record is in a confused state. There is testimony to the effect that when petitioner could do better by buying logs on the open market, it did so, and when the reverse was true, it would satisfy its requirements with its own timber. There is also testimony to the effect that logs produced at Clear Lake were charged to pulp operations by petitioner at prices estimated to be prevailing market prices, without reference to the actual cost of production, and there is a further statement as a note to a joint exhibit, that "logs produced in the Clear Lake Division and used in the Bellingham Division were charged to the Bellingham Division at a price estimated by the management to be the prevailing market price without reference to the actual cost of production in the Clear Lake Division." In the exhibit, however, it appears that the outside purchases of pulpwood logs in 1936 were made at $9.75 per thousand feet, as against a charge of $9.60 for logs from Clear Lake. For 1937, the situation was reversed, the cost of outside purchases being $12.92 per thousand feet, as against a charge of $13.20 for logs from Clear Lake. For 1938, the margin of the Clear Lake prices over open market prices was even greater, the Clear Lake charges being $10.41 per thousand feet, as against $8.49 for outside purchases. In 1939 there was another reversal of prices, when outside purchases were at $10.60 per thousand feet and the Clear Lake charges were $10.

In addition to the logs as shown above, the Bellingham mill, during the years 1936, 1937, 1938, and 1939, used 36,654, 23,908, 14,523, and 19,428 cords of pulpwood, all of which was purchased on the open market. The Anacortes mill, during the base period, used no cordwood.

It requires 900 to 1,000 board feet of wood to make a ton of pulp. In terms of cordwood, it takes 1.8 to 2 cords, or approximately 950 board feet, to make a ton of pulp.

Petitioner's income for the Clear Lake Division for each of the base period years was as follows:

|  | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Net sales | $554,849.39 | $651,869.81 | $96,469.64 | $217,280.03 |
| Cost of logs sold | 667,525.78 | 753,754.63 | 180,876.94 | 322,760.48 |
| Gross loss on sales | (112,676.39) | (101,884.82) | (84,407.30) | (105,480.45) |
| Selling, general, and administrative expenses | 17,440.27 | 11,416.45 | 21,625.79 | 4,182.09 |
| Net loss from operations | (130,116.66) | (113,301.27) | (106,033.09) | (109,662.54) |
| Other income | 40,548.62 | 17,392.18 | 5,033.15 | 7,963.41 |
| Gross loss | (89,568.04) | (95,909.09) | (100,999.94) | (101,699.13) |
| Income charges | 7,479.56 | 2,875.24 | -------------- | 200.99 |
| Net loss—Clear Lake Division [1] | (97,047.60) | (98,784.33) | (100,999.94) | (101,900.12) |

[1] This is from a stipulated schedule, and presumably is as shown by petitioner's books. There is no breakdown, incomewise, of the Clear Lake operations as between the logging operations for the open market and for petitioner's Bellingham and Anacortes mills. Admittedly, however, the pricing of the logs used by petitioner in its pulp mills was without reference to the actual cost of production, and it could be that the losses shown as having been sustained by the Clear Lake Division were wholly attributable to such pricing of logs to the pulp mills, and to the extent, if any, to which the logging operations for the open market were profitable, the Clear Lake losses resulting from such pricing of logs to the pulp mills were in excess of the Clear Lake losses shown.

During the base period petitioner had available an adequate supply of pulpwood, labor, fuel, sulphur, limerock, water, power, and other supplies for any increase which could reasonably be anticipated in its pulp-producing capacity.

Petitioner entered into pulp sales contracts at any time of the year. It entered into different types of contracts with different customers. At times, there would be spot sales, but ordinarily the sales would be on extended contracts, customarily for a year and sometimes for longer than a year. Sales might be at fixed prices or at maximum prices, or they might be on a quarterly adjustable basis. Sometimes they were at a guaranteed maximum. It was customary for petitioner to make discounts and concessions in prices for defective pulp and for various other reasons, particularly with domestic customers.

At the beginning of each of the base period years, petitioner had on hand "firm" orders for delivery of substantial quantities of pulp during each such year. Also at the beginning of the base period years, further orders for pulp were in process of negotiation. Due to subsequent adjustments, changes, modifications, and cancellations, petitioner's sales did not parallel the orders as received, even though

referred to as firm, and the extent to which the orders on hand at the beginning of the base period years actually resulted in sales is not shown of record. The so-called firm orders on hand, in tons, at the beginning of each of the base period years were as follows:

|  | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Domestic | 17,825 | 14,622 | 18,900 | 20,000 |
| Foreign | 9,274 | 32,597 | 68,415 | 4,256 |
| Total | 27,099 | 47,219 | 87,315 | 24,256 |

The number of tons of pulp produced, tons sold, the pulp inventory, insofar as shown, at December 31 for both the Bellingham and Anacortes mills, and the totals for both mills, for the years 1934 through 1939, were as follows:

| Year | Bellingham | | | Anacortes | | | Total tons produced | Total tons sold | Total inventory at December 31 |
|---|---|---|---|---|---|---|---|---|---|
| | Pulp produced | Pulp sold | Inventory at December 31 | Pulp produced | Pulp sold | Inventory at December 31 | | | |
| 1934 | 32,899 | 32,825 | ---------- | 22,377 | 22,361 | ---------- | 55,276 | 55,186 | ---------- |
| 1935 | 33,915 | 33,205 | 1,036 | 20,487 | 20,182 | 443 | 54,402 | 53,387 | 1,479 |
| 1936 | 37,298 | 37,146 | 1,188 | 25,730 | 24,570 | 1,603 | 63,028 | 61,716 | 2,791 |
| 1937 | 38,281 | 37,406 | 2,063 | 25,006 | 22,074 | 4,625 | 63,377 | 59,480 | 6,728 |
| 1938 | 47,682 | 47,122 | 2,622 | ---------- | 3,315 | 1,310 | 47,682 | 50,437 | 3,932 |
| 1939 | 87,577 | 89,005 | 1,194 | 6,839 | 7,480 | 669 | 94,416 | 96,485 | 1,863 |

The average daily production and the days operated by the Bellingham mill and the Anacortes mill, for the years 1934 through 1939, were as follows:

| Year | Bellingham | | Anacortes | |
|---|---|---|---|---|
| | Daily production (in tons) | Days operated | Daily production (in tons) | Days operated[1] |
| 1934 | 101 | 327 | 72 | 311 |
| 1935 | 98 | 344.5 | 75 | 273 |
| 1936 | 106.7 | 349.5 | 77 | 336 |
| 1937 | 109.5 | 349.5 | 79 | 315.5 |
| 1938 | 165.6 | 288 | ---------- | ---------- |
| 1939 | 245 | 357.5 | 82 | 83 |

[1] In 1936 and again in 1937, the Anacortes mill lost a few days of operation because of labor difficulties at the plant of the Morrison Mill Company, which chipped the pulpwood used and from which it bought its steam.

The production of the Bellingham mill, by months, the number of days operated each month, and the average daily production by months, for the base period years, were as follows:

| | Monthly production (in tons) | Days operated | Average daily production (in tons) | | Monthly production (in tons) | Days operated | Average daily production (in tons) |
|---|---|---|---|---|---|---|---|
| *1936* | | | | *1938* | | | |
| January | 3,151 | 30 | 105.0 | January | 3,152 | 29 | 108.7 |
| February | 2,992 | 28½ | 105.0 | February | 2,767 | 22½ | 123.0 |
| March | 3,213 | 30 | 107.1 | March | 2,923 | 29 | 100.8 |
| April | 3,106 | 29 | 107.1 | April | 2,845 | 28 | 101.6 |
| May | 3,242 | 30 | 108.1 | May | | | |
| June | 3,157 | 29½ | 107.0 | June | | | |
| July | 2,957 | 27½ | 107.5 | July | 3,518 | 31 | 113.5 |
| August | 3,226 | 30½ | 105.6 | August | 6,186 | 31 | 199.5 |
| September | 2,983 | 28½ | 104.7 | September | 6,119 | 28 | 218.5 |
| October | 3,194 | 30 | 106.5 | October | 6,906 | 31 | 222.8 |
| November | 3,118 | 28½ | 109.4 | November | 6,783 | 30 | 226.1 |
| December | 2,959 | 27½ | 107.6 | December | 6,483 | 28½ | 227.5 |
| Total 1936 | 37,298 | 349½ | 106.7 | Total 1938 | 47,682 | 288 | 165.6 |
| *1937* | | | | *1939* | | | |
| January | 3,201 | 30 | 106.7 | January | 7,342 | 31 | 236.8 |
| February | 2,899 | 27½ | 105.4 | February | 6,397 | 28 | 228.5 |
| March | 3,174 | 30 | 105.8 | March | 7,228 | 30½ | 237.0 |
| April | 3,174 | 29½ | 107.6 | April | 7,237 | 30 | 241.2 |
| May | 3,270 | 30 | 109.0 | May | 7,433 | 31 | 239.8 |
| June | 3,173 | 30 | 105.8 | June | 7,198 | 30 | 239.9 |
| July | 3,118 | 28½ | 109.4 | July | 6,845 | 28 | 244.5 |
| August | 3,425 | 30 | 114.2 | August | 7,560 | 31 | 243.9 |
| September | 3,205 | 28 | 114.5 | September | 7,067 | 29 | 243.7 |
| October | 3,404 | 30 | 113.5 | October | 8,054 | 31 | 259.8 |
| November | 3,220 | 28½ | 113.0 | November | 7,792 | 30 | 259.7 |
| December | 3,018 | 27½ | 109.7 | December | 7,424 | 28 | 265.1 |
| Total 1937 | 38,281 | 349½ | 109.5 | Total 1939 | 87,577 | 357½ | 245.0 |

Bulkley, Dunton Pulp Company, Inc., New York City, sometimes referred to hereafter as Bulkley Dunton, was a distributor or agent for pulp mills, including petitioner. On its sales of petitioner's pulp it received a commission of 3½ per cent on the f. o. b. mill price. All of its sales of petitioner's pulp were domestic sales and most, if not all, were made in the Midwest and East Coast regions of the United States. Petitioner's own personnel handled its sales to purchasers in the Pacific coast area. It paid no commissions on either its Pacific coast sales or its export sales.

During February through December of 1937 and the years 1938 and 1939, Bulkley Dunton sold pulp for domestic and foreign pulp producers as follows:

| Year | Total | | Domestic [1] | | Foreign [1] | |
|---|---|---|---|---|---|---|
| | Sales | Tons | Sales | Tons | Sales | Tons |
| 1937 (2/1–12/31) | $10,881,298.17 | 228,091 | $3,706,892.14 | 60,606 | $7,174,206.03 | 167,485 |
| 1938 | 7,076,526.86 | 155,322 | 1,831,290.41 | 38,685 | 5,245,236.45 | 116,637 |
| 1939 | 9,134,871.31 | 215,849 | 4,464,269.71 | 97,218 | 4,670,601.60 | 118,631 |

[1] Domestic includes Canadian mills, but Foreign excludes such mills.

For the same periods, the sales of petitioner's pulp, in tons, by Bulkley Dunton, were as follows: [8]

| Year | Bellingham mill | Anacortes mill | Total |
|---|---|---|---|
| 1937 (2/1–12/31) | 7,665 | 3,158 | 10,823 |
| 1938 | 9,552 | 2,125 | 11,677 |
| 1939 | 40,816 | 4,271 | 45,087 |

As shown by Bulkley Dunton on its sales records, the grades of pulp sold by it for petitioner during the base period years were variously designated or described as sulphite, prime sulphite, unbleached sulphite, prime unbleached sulphite, Star Brand, mixed sulphite, easy bleaching sulphite, prime regular unbleached sulphite, prime bleachable sulphite, strong unbleached sulphite, Direct Furnish pulp, Direct Furnish unbleached sulphite, special prime unbleached sulphite, glassine unbleached sulphite, and select unbleached sulphite. The designated grades recurring most frequently were described as unbleached sulphite and prime unbleached sulphite. Beginning with 1937, however, sales of easy bleaching sulphite and bleachable sulphite were not infrequent. The prices at which the various described grades were sold by Bulkley Dunton did not supply a readily discernible pattern as to the grades commanding the best prices, with the possible exception of easy bleaching pulp, the prices for which were usually higher than those shown for other grades. The prices were not even consistent on sales of the same grade of pulp on the same day.[9] The

---

[8] These figures are as shown on Joint Exhibit 68–PPP, which, by the stipulation of the parties, consists of "photostats of the monthly summary page of the sales ledger of Bulkley, Dunton Pulp Co., Inc., for each month from February 1937 through December 1939." They cannot be reconciled, however, with another stipulation, to the effect that all of petitioner's domestic sales, except to Pacific coast customers, were made by Bulkley Dunton, or with two other stipulated exhibits. One of these exhibits, 40–NN, purports to show all of petitioner's domestic sales, including the detail as to location of each customer whether in the Pacific coast area or other parts of the United States. The other exhibit, 69–QQQ, is made up of photostats of Bulkley Dunton's Pulp Purchase Record (Customers' Lot Book), which records the parties have stipulated contain the details of every sale of pulp by Bulkley Dunton from December 31, 1935, to June 9, 1940. For the Bellingham mill alone, Exhibit 40–NN shows domestic sales, other than Pacific coast sales, of 18,343.18 tons in 1936, 18,872.81 tons in 1937, 28,443.95 tons in 1938, and 68,221.39 tons in 1939, and the payment of commissions thereon. Similarly, the amount of petitioner's pulp reflected by 69–QQQ, the Bulkley Dunton Pulp Purchase Record, is far greater than the amount shown by 68–PPP as having been sold by Bulkley Dunton during the periods indicated. Contrary, however, to the stipulation that 69–QQQ contains the detail of every sale of pulp by Bulkley Dunton for the period stated, the amount of actual sales of petitioner's pulp by Bulkley Dunton for the said period is not determinable therefrom, since considerable quantities of petitioner's pulp are shown merely as being on consignment, with no indication of completed sales, and in other instances, the amounts are listed as ranging between a low figure and a high figure. Other lots are shown by cars, and not by pounds or tons.

[9] An illustration is in sales made in August 1937. On August 25 of that year, 693 tons of petitioner's prime unbleached sulphite were sold at $47.51 per ton on-dock Baltimore, Maryland, and on the same date 97 tons of the same described pulp were sold, also on-dock Baltimore, at $39 per ton. Among other sales confusing the sales pattern as described by

first sales of petitioner's sheeted pulp as shown by the Bulkley Dunton records were in May of 1938.

According to petitioner's sales journal, the grades of pulp sold were to a large extent designated merely as No. 1, No. 2, or No. 3. This was particularly true of the years 1936, 1937, and up to May of 1938, during which period only occasionally were there additional or further descriptions, such as Star, easy bleaching, strong, shredded, super easy bleaching, soft, special soft, special strong, and screenings. Beginning with May of 1938, the use of descriptive terms, with or without the designation of grades by numerals, was more frequent, and included sheet, sheet tissue, bleachable sheet, easy sheet, strong sheet, unbleached sheet, bleachable, prime, prime easy bleaching, half prime, shredded, D. F., glassine, screenings, and, in at least one instance, extra strong. During 1939 the descriptions most commonly appearing were No. 1 strong, No. 1 bleachable, No. 1 special bleachable, No. 1 easy bleaching, No. 1 D. F., No. 1 glassine, No. 1 special, No. 1 tissue, and screenings. Very little of the pulp shown as sold in the export market during the years 1936 and 1937 was described as other than easy bleaching.

Petitioner's gross domestic sales of pulp and its gross export sales of pulp, less freight absorbed, marine insurance, and returns, from its Bellingham and Anacortes mills, for the base period years, were as follows:

| Year | Bellingham mill | | Anacortes mill | |
|---|---|---|---|---|
| | Domestic | Exports | Domestic | Exports |
| 1936 | $658,387.78 | $495,358.27 | $120,037.09 | $638,003.59 |
| 1937 | 1,014,385.46 | 452,580.73 | 200,669.28 | 809,926.24 |
| 1938 | 1,026,568.66 | 584,024.14 | 56,953.25 | 53,446.81 |
| 1939 | 2,160,721.04 | 462,724.40 | 168,970.11 | 123,627.02 |

Petitioner's sales of pulp produced by its Bellingham mill for the years 1936 through 1939, on a per ton basis, in terms of the gross or delivered price [10] and the gross or delivered price, less freight absorbed

the Bulkley Dunton sales records were the sales of No. 2 quality shredded pulp, one car on August 12 and a second car on August 27, 1937, for $65 per ton f. o. b. Cloquet, Minnesota, as compared with a sale on August 3, of 9,600 tons of unbleached sulphite for $56.60 per ton f. o. b. C. L. and the sale on August 14 of 196 tons of prime unbleached sulphite for $45 per ton c. i. f. Philadelphia. At or about the time of these sales, there were very few sales of what might be regarded as petitioner's better quality pulp at prices comparable to the price at which the No. 2 quality pulp was sold f. o. b. Cloquet, Minnesota.

[10] These figures are prior to adjustments to petitioner's total gross sales from its Bellingham mill in the nature of additions to gross sales of $550.42 for 1936 and $531.87 for 1937, and reductions in total gross sales of $4,992.02 for 1938 and $12,456.83 for 1939. In the statement of the per ton delivered prices less freight and allowances, however, effect has been given to the stated adjustments to total gross sales for each year, as well as adjustments of $1,019.34 for 1936, $758.51 for 1937, $1,699.95 for 1938, and $2,268.01 for 1939, representing increases in the amount of freight absorbed by petitioner for each such year.

by petitioner, marine insurance, returns and allowances, and adjustments, but without any reduction for commissions, were as follows:

| Year | Domestic sales | | Foreign sales | |
|---|---|---|---|---|
| | Gross or delivered price per ton | Gross or delivered price less freight and allowances | Gross or delivered price per ton | Gross or delivered price less freight and allowances |
| 1936 | $38.30 | $31.39 | $36.94 | $30.62 |
| 1937 | 45.69 | 39.93 | 45.70 | 37.70 |
| 1938 | 39.74 | 31.77 | 48.71 | 39.44 |
| 1939 | 38.48 | 29.29 | 38.93 | 30.38 |

The petitioner's sales of pulp produced by its Anacortes mill for the years 1936 through 1939, on a per ton basis, in terms of the gross or delivered price [11] and the gross or delivered price, less freight absorbed by petitioner, marine insurance, returns and allowances, and adjustments, but without any reduction for commissions, were as follows:

| Year | Domestic sales | | Foreign sales | |
|---|---|---|---|---|
| | Gross or delivered price per ton | Gross or delivered price less freight and allowances | Gross or delivered price per ton | Gross or delivered price less freight and allowances |
| 1936 | $39.65 | $30.00 | $35.04 | $31.02 |
| 1937 | 52.53 | 43.40 | 55.18 | 46.46 |
| 1938 | 38.06 | 26.79 | 55.15 | 44.95 |
| 1939 | 48.05 | 37.85 | 45.49 | 40.19 |

The water and rail freight rates per ton shipping weight, for the base period years, from petitioner's mills to points as designated, were as follows:

Via water from Anacortes and Bellingham to:

| Effective dates | Japan | China |
|---|---|---|
| Jan. 1, 1936 to Sept. 30, 1936 | $3.50 | $4.00 |
| Oct. 1, 1936 to Apr. 30, 1937 | 3.75 | 4.25 |
| May 1, 1937 to July 31, 1937 | 5.00 | 5.50 |
| Aug. 1, 1937 to Apr. 12, 1938 | 8.00 | 8.50 |
| Apr. 13, 1938 to May 16, 1938 | 7.00 | 7.50 |
| May 17, 1938 to Apr. 27, 1939 | 6.00 | 6.50 |
| Apr. 28, 1939 to Sept. 30, 1939 | 5.50 | 6.00 |
| Oct. 1, 1939 to Dec. 31, 1939 | 7.50 | 8.00 |

Inter-coastal (by water)—Pacific coast to Atlantic coast ports:

| Effective dates | |
|---|---|
| Jan. 1, 1936 to July 5, 1936 | $5.40 |
| July 6, 1936 to May 31, 1937 | 6.00 |
| June 1, 1937 to Dec. 16, 1937 | 6.50 |
| Dec. 17, 1937 to Dec. 31, 1939 | 7.00 |

[11] The gross sales prices per ton for the Anacortes mill are before adjustment reductions in total gross sales of $290.56 for 1936, $11,205.41 for 1937, and $451.62 for 1939. The net sales prices per ton are after giving effect to increases in freight absorbed by petitioner of $149.71 for 1936, $586.22 for 1937, and $72.91 for 1939.

Via rail—Bellingham to:

| Effective dates | Michigan-Indiana "C" Territory | Wisconsin-Illinois "D" Territory |
|---|---|---|
| Jan. 1, 1936 to Nov. 27, 1938 | $10 | $9.00 |
| Nov. 28, 1938 to Mar. 31, 1939 | 11 | 10.00 |
| Apr. 1, 1939 to Dec. 31, 1939 | 11 | 9.40 |

MONTHLY AVERAGE OF ABOVE FIGURES

| Year | Water | | | Rail | | |
|---|---|---|---|---|---|---|
| | Japan | China | Inter-coastal | Michigan-Indiana "C" Territory | Wisconsin-Illinois "D" Territory | Midwest "C"-"D" |
| 1936 | $3.56 | $4.06 | $5.70 | $10.00 | $9.00 | $9.50 |
| 1937 | 5.83 | 6.33 | 6.29 | 10.00 | 9.00 | 9.50 |
| 1938 | 6.14 | 6.60 | 7.00 | 10.08 | 9.08 | 9.58 |
| 1939 | 6.17 | 6.67 | 7.00 | 11.00 | 9.55 | 10.28 |

The marine insurance rates, cents per $100 of value (based on selling price), during the base period years, from petitioner's plants to specified points, were as follows:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| From Bellingham or Anacortes to: | | | | |
| Atlantic coast ports | 40.8 | 45 | 32.5 | 32.5 January to August. 42.5 September to December. |
| California ports | (1) | 17 | 15.0 | 17.5 January to October. 20. November and December. |
| India | (1) | (1) | 72.5 | 100. ($1.). |
| Shanghai | 38. | 37.5 | (1) | 80. |
| Yokohama | 45. | 42.5 January to July. 60 August to December. | (2) | (1). |
| Osaka | 38. | 42.5 January to July. 62.5 August to December. | (2) | 62.5. |
| Manchester, London, and Glasgow | 40. | (2) | (1) | (1). |
| Hull, England | 50. | (2) | (1) | (1). |
| Belfast, Ireland | 45. | (2) | (1) | (1). |
| France | (2) | (2) | 42.5 | (2). |
| Antwerp | (2) | (2) | 47.5 | (1). |
| Rotterdam | (2) | (2) | (2) | 55. |
| Brazil | (2) | (2) | 47.5 | 40. |
| Mexico | (2) | (2) | (2) | 60. |

[1] Sales made, but insurance not charged to petitioner.
[2] No shipments.
NOTE.—No insurance was charged to petitioner on rail shipments during any of the base period years.

On the domestic sales of pulp from petitioner's Bellingham mill, on which commissions were paid, such commissions were approximately $1.03 per ton in 1936, $1.27 per ton in 1937, $1.15 per ton in 1938, and $1.01 per ton in 1939.[12]

[12] Actually, the commissions per ton were slightly more in each of the years, since there were included in the totals on which the above averages were computed, some sales to Pacific coast customers, on which no commissions were charged. The commissions paid per ton on the domestic sales from the Anacortes mill are not shown or approximated, for the reason that they have not been worked out by the parties from any data of record, and the benefits of such computations, for the purposes here, would not justify such mathematical work on the part of the Court, assuming the facts necessary for such computation are of record.

As shown by the 1942 Supplement, Survey Current Business, the prices as reflected by monthly averages for "unbleached, prime quality, easy bleaching" sulphite pulp on-dock Atlantic seaboard ports, for the base period years, were as follows:

| Year | Price per ton |
|---|---|
| 1936 | $42. 66 |
| 1937 | 69. 68 |
| 1938 | 47. 68 |
| 1939 | 41. 44 |

The gross sales, net sales, cost of sales, and net income on the sales of pulp from the Bellingham mill for the base period years, and various costs and expenses of such sales on a per ton basis [13] for the said years, were as follows:

| | 1936 | | 1937 | | 1938 | | 1939 | |
|---|---|---|---|---|---|---|---|---|
| | Per ton | Amount | Per ton | Amount | Per ton | Amount | Per ton | Amount |
| Tons of pulp produced__ | _____ | 37, 298 | _____ | 38, 281 | _____ | 47, 682 | _____ | 87, 577 |
| Days plant operated_____ | _____ | 349. 5 | _____ | 349. 5 | _____ | 293 | _____ | 357. 5 |
| Tons of pulp sold_____ | _____ | 37, 146 | _____ | 37, 406 | _____ | 47, 122 | _____ | 89, 005 |
| Gross sales_____ | $36. 96 | $3, 372, 656. 22 | $45. 71 | $1,709,788.68 | $42. 46 | $2,000,536.93 | $38. 42 | $3,419,335.64 |
| Less: | | | | | | | | |
| Freight and marine insurance_____ | 5. 77 | 214, 213. 15 | 6. 46 | 241, 565. 23 | 8. 24 | 388, 061. 66 | 8. 91 | 793, 184. 71 |
| Returns and allowances_____ | . 13 | 4, 697. 02 | . 03 | 1, 257. 26 | . 04 | 1, 882. 47 | . 03 | 2, 705. 49 |
| Net sales_____ | 31. 06 | 1, 153, 746. 05 | 39. 22 | 1, 466, 966. 19 | 34. 18 | 1, 610, 592. 80 | 29. 48 | 2, 623, 445. 44 |
| Cost of sales: | | | | | | | | |
| Cost of chips used_____ | 13. 20 | 490, 278. 81 | 15. 84 | 593, 356. 83 | 13. 55 | 638, 521. 25 | 13. 07 | 1, 163, 451. 73 |
| Other direct costs_____ | 13. 80 | 512, 492. 64 | 14. 09 | 526, 990. 58 | 13. 88 | 653, 840. 14 | 12. 65 | 1, 125, 814. 64 |
| Total_____ | 27. 00 | 1, 002, 771. 45 | 29. 95 | 1, 120, 347. 41 | 27. 43 | 1, 292, 361. 39 | 25. 72 | 2, 289, 266. 37 |
| Gross income_____ | 4. 06 | 150, 974. 60 | 9. 27 | 346, 618. 78 | 6. 75 | 318, 231. 41 | 3. 76 | 334, 479. 07 |
| Shipping expense_____ | 1. 00 | 37, 058. 20 | . 97 | 36, 229. 86 | . 56 | 26, 415. 24 | . 16 | 14, 327. 19 |
| Selling expenses_____ | . 78 | 28, 962. 01 | 1. 12 | 41, 980. 85 | . 96 | 45, 172. 57 | 1. 11 | 98, 411. 27 |
| Net income from sales___ | 2. 28 | 84, 954. 39 | 7. 18 | 268, 408. 07 | 5. 23 | 246, 643. 60 | 2. 49 | 221, 440. 61 |
| Other income_____ | . 29 | 10, 652. 09 | . 51 | 19, 267. 55 | . 30 | 14, 294. 92 | . 24 | 21, 713. 15 |
| Net income before shutdown and other expenses _____ | 2. 57 | 95, 606. 48 | 7. 69 | 287, 675. 62 | 5. 53 | 260, 938. 52 | 2. 73 | 243, 153. 76 |
| Shutdown expense_____ | | | | | . 77 | 36, 298. 68 | | |
| Inventory adjustment_ | | | . 68 | 25, 336. 09 | | | | |
| Obsolescence_____ | | | 1. 78 | 66, 750. 39 | | | | |
| Net income before adjustments_____ | 2. 57 | 95, 606. 48 | 5. 23 | 195, 589. 14 | 4. 76 | 224, 639. 84 | 2. 73 | 243, 153. 76 |
| Adjustments debts (credits): | | | | | | | | |
| Cost of sales: | | | | | | | | |
| Cost of chips used___ | _____ | 74. 31 | _____ | _____ | _____ | 10. 18 | _____ | _____ |
| Other direct costs____ | _____ | _____ | _____ | 182. 62 | _____ | (507. 45) | _____ | (222. 62) |
| Obsolescence charged to executive office____ | _____ | _____ | _____ | (66, 750. 39) | _____ | _____ | _____ | _____ |
| Net income_____ | _____ | 95, 532. 17 | _____ | 261, 656. 91 | _____ | 225, 137. 11 | _____ | 243, 376. 38 |

[13] The figures used are from schedules placed in the record by the parties as a joint exhibit. Various of the costs per ton as shown on the exhibit are mathematically inaccurate in varying degrees, when related to the totals from which purportedly they have been derived.

The gross sales, net sales, cost of sales and net income on the sales of pulp from the Anacortes mill for the base period years, and various costs and expenses of such sales on a per ton basis [14] for the said years, were as follows:

| | 1936 | | 1937 | | 1938 | | 1939 | |
|---|---|---|---|---|---|---|---|---|
| | Per ton | Amount | Per ton | Amount | Per ton | Amount | Per ton | Amount |
| Tons of pulp produced | ------ | 25,730 | ------ | 25,096 | ------ | ------------ | ------ | 6,839 |
| Days plant operated | ------ | 336 | ------ | 315.5 | ------ | (¹) | ------ | 83 |
| Tons of pulp sold | ------ | 24,570 | ------ | 22,074 | ------ | 3,315 | ------ | 7,480 |
| Gross sales | $35.78 | $879,018.83 | $54.06 | $1,193,790.58 | $44.19 | $146,490.15 | $47.32 | $353,975.96 |
| Less: | | | | | | | | |
| Freight and marine insurance | 4.87 | 119,586.02 | 8.20 | 181,122.25 | 10.89 | 36,090.09 | 8.20 | 61,372.07 |
| Returns and allowances | .06 | 1,392.13 | .09 | 2,072.81 | ------ | ------------ | ------ | 6.76 |
| Net sales | 30.85 | 758,040.68 | 45.77 | 1,010,595.52 | 33.30 | 110,400.06 | 39.12 | 292,597.13 |
| Cost of sales: | | | | | | | | |
| Cost of chips used | 14.13 | 363,628.60 | 18.84 | 472,792.42 | ------ | ------------ | 19.43 | 132,913.83 |
| Other direct costs | 14.13 | 350,428.77 | 15.81 | 292,280.03 | 33.32 | 110,455.98 | 13.97 | 116,924.71 |
| Total | 29.06 | 714,057.37 | 34.65 | 765,072.45 | 33.32 | 110,455.98 | 33.40 | 249,838.54 |
| Gross income | 1.79 | 43,983.31 | 11.12 | 245,523.07 | (.02) | (55.92) | 5.72 | 42,758.59 |
| Shipping expense | 1.12 | 27,601.35 | 1.04 | 22,884.03 | 1.69 | 5,608.19 | .86 | 6,405.69 |
| Selling expenses | .38 | 9,300.67 | .68 | 15,181.29 | .99 | 3,273.95 | 1.05 | 7,854.39 |
| Net income from sales | .29 | 7,081.29 | 9.40 | 207,457.75 | (2.70) | (8,938.06) | 3.81 | 28,498.51 |
| Other income | .58 | 14,174.14 | .70 | 15,565.78 | .02 | 55.73 | .19 | 1,427.63 |
| Net income before shutdown and other expenses | .87 | 21,255.43 | 10.10 | 223,023.53 | (2.68) | (8,882.33) | 4.00 | 29,926.14 |
| Shutdown expense | .07 | 1,662.00 | .30 | 6,611.04 | 32.36 | 107,272.91 | 6.72 | 50,290.28 |
| Inventory adjustment | ------ | ------------ | .38 | 8,385.54 | 2.37 | 7,860.00 | .59 | 4,400.00 |
| Net income before adjustments | .80 | 19,593.43 | 9.42 | 208,026.15 | (37.41) | (124,015.24) | (3.31) | (24,764.14) |
| Adjustments—Debit—(Credit): | | | | | | | | |
| Cost of sales—other direct costs | ------ | (477.67) | ------ | 280.26 | ------ | ------------ | ------ | (299.75) |
| Shipping expense | ------ | ------------ | ------ | ------------ | ------ | ------------ | ------ | 150.00 |
| Selling expense | ------ | ------------ | ------ | ------------ | ------ | ------------ | ------ | ------------ |
| Net income | ------ | 20,071.10 | ------ | 207,745.89 | ------ | (124,015.24) | ------ | (24,614.39) |

None.

The costs of labor [15] entering into the various operations in petitioner's manufacture of pulp for its Bellingham mill, for the base period years, were as follows:

[14] The figures used are from schedules placed in the record by the parties as a joint exhibit. Various of the costs per ton as shown on the exhibits are mathematically inaccurate in varying degrees, when related to the totals from which purportedly they have been derived.

[15] The figures given do not show or include the labor costs per ton in the cut-up plant. Apparently the Morrison Company mill, acquired in 1936 or 1937, and converted into a cut-up plant for the Bellingham mill, did not go into operation until 1937. The cut-up work for the Bellingham mill for 1936 had been done by the Morrison Mill Company, and the cut-up labor costs, if any, incurred by petitioner in that year have not been segregated from the over-all cost of pulpwood. For 1937, cut-up costs are shown at $2.12 per ton of pulp produced, but there is no breakdown as between labor costs and other costs. For 1938, the labor costs of running the cut-up plant are shown as $1.88 per ton of pulp produced, and for 1939 as $1.36 per ton of pulp produced.

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Wood handling | $0.87 | $0.87 | $1.55 | $0.46 |
| Wood cleaning | | | ( | .74 |
| Wood chipping | .39 | .43 | (1.17 | .28 |
| Boiler room | .28 | .31 | .26 | .19 |
| Acid plant | .24 | .26 | .20 | .12 |
| Digestor and blow pit | .44 | .52 | .53 | .48 |
| Screen room | .17 | .19 | .19 | .16 |
| Drying room | 1.28 | 1.51 | 1.24 | .91 |
| Superintendence | .35 | .37 | .26 | .18 |
| General | .14 | .23 | .27 | .27 |
| Total of labor elements | 4.16 | 4.69 | 5.67 | 3.79 |

The basic rates per hour from which petitioner's labor costs were derived during the base period years were 47.5 cents per hour from January 1, 1936, through May 31, 1936; 52.5 cents per hour from June 1, 1936, through May 31, 1937; and 62.5 cents per hour from June 1, 1937, through December 31, 1939.

To some degree, the new Bellingham mill in its manufacturing operations was more economical in its consumption of materials and supplies than the old Bellingham mill.

The Federal Reserve indexes of industrial production, paper and pulp production, pulp production, and sulphite pulp production for the years 1923 through 1939, based upon a 1935–1939 average of 100 for all indexes and physical volume of production, were as follows:

| Year | Industrial production | Paper and pulp production | Pulp production | Sulphite pulp production |
|---|---|---|---|---|
| 1923 | 88 | 65 | 61 | 78 |
| 1924 | 82 | 67 | 59 | 71 |
| 1925 | 90 | 73 | 64 | 77 |
| 1926 | 96 | 79 | 71 | 86 |
| 1927 | 95 | 80 | 71 | 85 |
| 1928 | 99 | 84 | 75 | 86 |
| 1929 | 110 | 90 | 81 | 92 |
| 1930 | 91 | 84 | 77 | 86 |
| 1931 | 75 | 77 | 73 | 78 |
| 1932 | 58 | 66 | 61 | 63 |
| 1933 | 69 | 76 | 71 | 73 |
| 1934 | 75 | 75 | 74 | 79 |
| 1935 | 87 | 86 | 82 | 87 |
| 1936 | 103 | 98 | 95 | 100 |
| 1937 | 113 | 107 | 111 | 118 |
| 1938 | 89 | 95 | 97 | 88 |
| 1939 | 109 | 113 | 116 | 107 |

The compiled net profit or loss before Federal income taxes of corporations in the paper, pulp, and products industry, for the years 1920 through 1939, were as follows:

| Year | Total as reported | | Total less tax-exempt income | | Total less tax-exempt income plus interest paid | |
|---|---|---|---|---|---|---|
| | Amount ($1,000) | Index 1922–39=100 | Amount ($1,000) | Index 1922–39=100 | Amount ($1,000) | Index 1922–39=100 |
| 1920 | (1) | ----------- | 237,582 | 364.1 | (1) | ----------- |
| 1921 | (1) | ----------- | (4,297) | (6.6) | (1) | ----------- |
| 1922 | 65,549 | 86.1 | 61,616 | 94.4 | 78,151 | 84.2 |
| 1923 | 100,045 | 131.4 | 94,977 | 145.5 | 114,032 | 122.9 |
| 1924 | 78,427 | 103.0 | 74,312 | 113.9 | 93,195 | 100.5 |
| 1925 | 104,051 | 136.6 | 99,050 | 151.8 | 120,901 | 130.3 |
| 1926 | 116,172 | 152.5 | 106,097 | 162.6 | 134,212 | 144.7 |
| 1927 | 121,368 | 159.4 | 110,373 | 169.1 | 139,923 | 150.8 |
| 1928 | 121,023 | 158.9 | 103,631 | 158.8 | 139,799 | 150.7 |
| 1929 | 128,694 | 169.0 | 104,453 | 160.1 | 137,826 | 148.6 |
| 1930 | 62,691 | 82.3 | 37,262 | 57.1 | 79,722 | 85.6 |
| 1931 | (5,234) | (6.9) | (16,303) | (25.0) | 23,389 | 25.2 |
| 1932 | (57,334) | (75.3) | (64,473) | (98.8) | (28,593) | (30.8) |
| 1933 | 21,134 | 27.7 | 16,265 | 24.9 | 49,404 | 53.3 |
| 1934 | 59,554 | 78.2 | 52,471 | 80.4 | 78,016 | 84.1 |
| 1935 | 73,260 | 96.2 | 60,327 | 92.4 | 84,224 | 90.8 |
| 1936 | 108,041 | 141.9 | 91,743 | 140.6 | 112,834 | 121.6 |
| 1937 | 128,326 | 168.5 | 110,880 | 169.9 | 133,465 | 143.9 |
| 1938 | 44,249 | 58.1 | 38,005 | 58.2 | 62,265 | 67.1 |
| 1939 | 100,843 | 132.4 | 93,888 | 143.9 | 117,198 | 126.3 |
| Average: 1922–1939 | 76,159 | 100.0 | 65,254 | 100.0 | 92,776 | 100.0 |

[1] Not available.

NOTE.—Years 1920–1937 consist of paper and products including carbon papers, cardboard, cartons, celotex, cigarette papers, coated paper, compo board, dress patterns, envelopes, fiber and fiber products other than furniture or trunks, leather board, oiled paper, paper bags, paper boxes, paper containers, paper utensils, plaster boards, pressboard, roofing paper, stationery, tar paper, tissue paper, wallpaper, wrapping paper.

In years 1938–1939 are included the following categories of the revised industrial classification: (1) Pulp paper, and paperboards, (2) pulp and paper converted products, and (3) paper and paper products not allocable. The following items (not included in prior years) are included in 1938–1939: (1) Wallpaper printing, and (2) playing cards. The following items (included in prior years) are not included in 1938–1939: (1) Wallboard, plaster board, (2) carbon paper, (3) cellulose, cellophane, (4) paper stencils, and (5) inked ribbon.

The capacity of petitioner's Bellingham mill as it existed at December 31, 1939, was not in excess of 265 tons of pulp per day, or 92,750 tons per year.

By reason of the construction of the new Bellingham mill in the base period, petitioner's average base period net income was not an adequate standard of normal earnings for the said period.

The amount which would have been petitioner's average base period net income if the Bellingham mill as it existed at December 31, 1939, had been in operation from the beginning of the base period, would not be an amount large enough to produce an excess profits credit greater than the credit computed on the basis of petitioner's invested capital, without the benefit of section 722 of the Internal Revenue Code of 1939.

### OPINION.

TURNER, *Judge:* It is the position of the petitioner that it qualifies for excess profits tax relief under subsections (b) (1), (b) (2), and

(b) (4) of section 722 of the Internal Revenue Code of 1939,[16] and that a fair and just amount representing normal earnings to be used as a constructive average base period net income determined under section 722 (a) [16] will provide the relief sought. As supporting its claims under subsections (b) (1) and (b) (2), it relies on the loss of Japanese and Chinese sales in 1937 and 1938. As a further basis for qualification under subsection (b) (2), it contends that its business, as well as the industry of which it was a member, was depressed during 1938 and 1939 because foreign importers dumped pulp on the domestic market, in violation of the Act of May 27, 1921, known as the Anti-Dumping Act. For qualification under subsection (b) (4), it relies on the construction of its new Bellingham mill in 1937-1938, which mill went into operation in 1938.

The respondent disputes petitioner's claims of qualification for section 722 relief under subsections (b) (1) and (b) (2). He agrees that by reason of the construction of the new Bellingham mill during the base period, petitioner does qualify for relief under section

---

[16] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer.

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation. * * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business * * *

722 (b) (4), but denies that the amount which, under section 722 (a), would be a fair and just amount representing normal earnings to be used as petitioner's constructive average base period net income is an amount sufficient to produce an excess profits credit which would give petitioner any relief under section 722. In other words, it is his position that the excess profits credit computed on the basis of petitioner's invested capital, without the benefit of section 722, is greater than the excess profits credit based on a fair and just reconstructed average base period net income.

In contrast with subsection (b) (2), the application of which is limited to economic circumstances which depress the business of the taxpayer and are temporary and unusual in its case, subsection (b) (1), being restricted in its application to occurrences which have interrupted or diminished "production, output, or operation," deals primarily with cases wherein the normal operation of the plant, the normal production of goods, or the normal rendering of services has been interfered with by the occurrence of a physical event. The wording of the statute, its legislative history, the respondent's regulations and various of the decided cases so indicate. See *Southern California Edison Co.*, 19 T. C. 935, at page 980. In *United Motor Coach Co.*, 22 T. C. 578, we have heretofore noted, however, that the respondent, in his regulations, has not interpreted (b) (1) as being restricted exclusively to physical events which directly interfere with or prevent production, output, or operation. Section 35.722–(3) (a) of Regulations 112 provides, in part, that "a diminution in the taxpayer's production caused by a low demand for the product of the taxpayer resulting from the effects of war conditions in the country in which the taxpayer sold a substantial portion of its production may be an event which might form the basis of a claim for relief under section 722 (b) (1)." It is on this provision that petitioner places its reliance for qualification under subsection (b) (1), its contention being that its loss of orders for pulp in 1937 and 1938 from both Japan and China resulted from the effects of war conditions in those countries.

Certainly, there were no war conditions in Japan in the sense that armed conflict was actually being waged there. The petitioner points, however, to the Japanese invasion of Manchuria in 1931, and to its taking of Shanghai in 1937, and argues that the supporting of these movements and the general building up of the Japanese Armed Forces demonstrate the existence of war conditions in Japan. Whether or not these conditions may properly be regarded as war conditions, within the meaning of the regulation, we are convinced, on the facts, that they do not represent the causal factors from which petitioner's loss of pulp orders in 1937 and 1938 resulted. The facts show that,

over the years, Japan has had continuing difficulties in maintaining a sound economy. Having a large and rapidly growing population, it has had a large supply of cheap labor which it could utilize in processing and manufacturing goods for export. But being a country of limited natural wealth, it has consistently been short not only of the raw materials which it must have for the production of export goods it must produce if it is to maintain a balanced economy, but also of materials needed for home consumption. For a considerable period following World War I, its production and trade was increased, and it had an expanding and what appeared to be a prosperous economy. But by the late 1920's and in the early 1930's, its trade and exchange problems had become critical. Its most noteworthy raw product had been silk, and silk, whether raw or finished, had been the dominant item in its export trade. The raw materials for the manufacturing of other textiles had to be imported. But, by that time, most of its silk trade had been lost, and its total trade showed an increasing import balance. One of the steps taken to improve her condition was to develop her rayon trade to make up for the loss of the silk trade. But to produce rayon, it had to have pulp, and its production of the highly purified, bleached pulp suitable for conversion into rayon up to that time had been comparatively negligible. Payment for the resulting excess of imports over exports was being accomplished by the shipment of capital, which further aggravated the situation. Japan abandoned the gold standard in 1931, and in July of 1932, enacted the Capital Flight Prevention Act. The results of these efforts proved to be disappointing, but the Exchange Control Law of 1933 appeared to be more effective. Quantities of raw materials were accumulated at the then existing low prices and a program of industrial expansion, which would better utilize the Japanese manpower, was launched. For the next few years, conditions improved, until in 1935, there was actually a favorable balance in merchandise items for the first time since 1918. In 1936, however, it appeared that Japan was again losing out in its efforts to maintain a satisfactory trade balance. By August 10, 1936, the surplus of imports over exports for the year was 291,872,000 yen, which unfavorable balance was only partially relieved during the latter part of the year, which was regarded as the export season and looked to for an excess of exports as a means of reducing the adverse balance built up during the first part of the year. By January of 1937, the situation was such that the Government found it necessary to take steps to strengthen exchange controls, which it did through Ordinance No. 1 of January 8, 1937, requiring the procuring of a license from the Minister of Finance for the securing of exchange with which to pay for imports of merchandise over minimum amounts. Thereafter, there was the transition from exchange control proper to

exchange control as a form of trade control, and what started out as a program "for the time being," became, for all practical purposes, permanent. By August 10 of 1937, the surplus of 1937 imports over exports was 744,134,000 yen, and by September 10, 1937, this surplus had increased to 786,000,000 yen.

We do not ignore the presence of conditions relied upon by petitioner as war conditions, and we do feel that conditions already bad and worsening were aggravated thereby, but we are convinced that the causal factors bringing about petitioner's loss of some of its 1937 pulp orders and all of its 1938 pulp orders were economic and much deeper and more far reaching than conditions upon which petitioner depends. In truth, it may well be that the conditions relied on were themselves a result of the same causal factors.

Also of significance, we think, is the fact that Japan, as a part of its program to build up its production and trade in rayon, also entered upon a program to bring about an increased domestic production of pulp, and while at the end of the base period Japanese production of pulp had not caught up with consumption, it had brought about a steady and substantial increase in the production of both rayon pulp and paper pulp. At the end of 1935, the Japanese annual production of pulp stood at 848,373 tons, while at December 31, 1939, it had increased to 1,180,132 tons, not including 48,395 long tons of 1939 Manchurian production. And though there was a cutback in the importation of pulp in 1938 and 1939 and the amount available for consumption was less in 1938 by 285,130 tons than in 1937 and 33,629 tons in 1936, it is reasonable to conclude, we think, that the increase in Japanese pulp production from 898,972 tons in 1936 to 1,069,857 tons in 1938, which there again did not include 17,102 long tons of Manchurian production, was to some degree the basis for the restriction which did occur in wood pulp imports, as contrasted with the restrictions on imports of goods of other character.

There is also a factual basis of record for the conclusion that the loss of Japanese business by American pulp producers, including petitioner, in the years 1937 and 1938, was due to some extent to competition in the world pulp market, and not solely to the conditions existing in Japan, whether they be said to be economic conditions or war conditions. Actually, Japanese pulp imports in 1937 were the highest for any year shown. They exceeded 1936 imports by a margin of 522,608 tons over 365,649 tons. Its paper pulp imports for 1937 were 197,218 tons, as compared with 176,244 tons for 1936. And yet, petitioner's exports of pulp to Japan dropped from 30,128 tons in 1936 to 23,966 tons in 1937. In contrast, Japan in 1937 imported 92,293 tons of paper pulp from Sweden, as against 50,748 tons in 1936. For 1938, it is true, as previously noted, that the total of Japanese imports

of pulp dropped drastically, particularly in the case of paper pulp, and in that year petitioner was able to sell no pulp in Japan and American pulp producers sold only 9,967 tons. In contrast, Sweden, in 1938, exported to Japan a total of 14,395 tons of paper pulp.

It is our opinion, on the facts of record, that petitioner's losses of Japanese pulp sales in 1937 and 1938 were the results of economic trends, conditions and circumstances, which, on the basis of Japanese business history, could reasonably have been expected, and in some degree to Swedish competition and to increased Japanese pulp production, and we accordingly conclude and hold that the petitioner has not shown qualification for section 722 relief under subsection (b) (1).

With respect to the loss by petitioner of its Chinese orders, the record is clearly otherwise. The facts show that Japanese military forces invaded and occupied Shanghai: that the Chinese mills whose orders were canceled had either been destroyed by shells and bombs, or were being used by the Japanese as military depots. The mill owners were unable to receive and the petitioner was unable to deliver the pulp for those reasons. War conditions did exist in the Shanghai area, and, by reason thereof, the petitioner lost pulp sales to the extent of 3,812 tons in 1937 and 2,688 tons in 1938. Under the respondent's regulations, the petitioner does qualify with respect to the loss of its Chinese business for section 722 relief under subsection (b) (1).

Under subsection (b) (2), a taxpayer qualifies for section 722 relief, if its business has been depressed in the base period because of temporary economic circumstances unusual in the case of the taxpayer or because the industry of which the taxpayer was a member was depressed by reason of temporary economic events unusual in the case of the industry. It is the claim of the petitioner that its loss of 1937 and 1938 pulp sales in Japan was the result of temporary economic circumstances unusual both in its case and in the case of the pulp industry, and that it accordingly qualifies for section 722 relief under (b) (2). The facts and the decided cases do not support the position taken. Much of what we have already said on petitioner's claim of qualification under (b) (1) is in point here, and need not be repeated. As noted in our Findings of Fact, trade barriers and restraints are as old as international trade, and constitute a continuing hazard to anyone engaged in such trade, and trade with Japan from the late 1920's through the base period provides an apt illustration. Such hazards normally make themselves felt by government action in establishing controls and restrictions on trade, and in the instant case the losses occurred when the Japanese Government moved to control, restrict, and prevent the import of the pulp which petitioner had on order. A depression of business by such government action is not

a qualifying circumstance under section 722 (b) (2). *Seekonk Lace Co.*, 24 T. C. 552; *Norfolk & Chesapeake Coal Co.*, 18 T. C. 904; *Packer Publishing Co.*, 17 T. C. 882; *Acme Breweries*, 14 T. C. 1034; and *Fish Net and Twine Co.*, 8 T. C. 96.

The petitioner makes the further claim for qualification under subsection (b) (2), on the ground that its business and the business of the pulp industry were depresed in 1938 and 1939 through the dumping of pulp by foreign producers in the domestic market at prices below cost, in violation of the Act of May 27, 1921, known as the Anti-Dumping Act. With respect to that contention, it is sufficient to say that there is not only an absence of supporting facts, but, to the contrary, it is to be noted that the American pulp producers duly filed complaints with the Treasury Department in 1939, charging that there was a subsidized dumping of foreign pulp in the United States market, in violation of the said statute, and in November of 1939, the Secretary of the Treasury issued a statement to the effect that after investigation and careful consideration of the evidence, the conclusion had been reached that findings of dumping of wood pulp imported from foreign countries were not justified.

The parties agree that the construction of the new Bellingham mill in the base period does qualify petitioner for section 722 relief under subsection (b) (4). They do not agree as to the amount which would be a fair and just amount to be used as petitioner's constructive average base period net income, based on the (b) (4) event, it being the position of the respondent that such fair and just amount would fall far short of providing any relief for petitioner.

At the outset, it should be noted that we have no issue, and there is no claim by petitioner, that it was committed prior to January 1, 1940, to a change in its capacity for production, which change was not consummated until after the end of the base period. As a consequence, our question has to do only with the change in petitioner's capacity for production in the base period, namely, with the capacity of the Bellingham mill as it stood at the close of business December 31, 1939. The reconstruction of both parties has been based on the assumed existence at January 1, 1936, of the Bellingham mill as it stood at the end of the base period.

In the absence of qualification under section 722 (b) (1) and (b) (2), above denied except as to lost Chinese sales, it is the position of the petitioner that the fair and just amount to represent its constructive average base period net income is $1,189,533. This construction is based on the proposition that the capacity of the Bellingham mill as it existed at December 31, 1939, was 100,000 tons of pulp per year, and if it had been in existence and in operation at and from January 1, 1936, it would have produced 100,000 tons of sheeted pulp for each of

the base period years, and that Bulkley Dunton would have acted as selling agent and would have sold in each year the entire 100,000 tons produced. As to the Anacortes mill, it assumes that for the years 1936 and 1937, it would have operated at capacity and would have produced 28,000 tons of pulp in each year, all of which would have been sold; that it would not have operated in 1938, and would have operated in 1939 only for the period in which it was actually operating. No reconstruction is claimed as to Anacortes for 1938 and 1939.

Based primarily on the testimony of the witness Enders, of Bulkley Dunton, it is the claim of the petitioner that its Bellingham output would have sold at average gross prices of $42.97 per ton for 1936, $58.30 for 1937, $42.44 for 1938, and $41.65 for 1939, as compared with the actual gross prices at which it sold its pulp during the base period years of $38.30 per ton for 1936, $45.69 for 1937, $39.74 for 1938, and $34.48 for 1939, and that the net sales prices per ton as reconstructed would be $37.07 for 1936, $50.12 for 1937, $33.97 for 1938, and $32.84 for 1939, as compared with actual net prices of $31.39 per ton for 1936, $39.93 for 1937, $31.77 for 1938, and $29.29 for 1939. It further contends that due to the efficiency of the new mill, the ratably lower labor costs, the lesser amount of labor required, and the economy of the new mill with respect to materials and supplies, the Bellingham pulp would have been produced at a saving over actual costs of $4.39 per ton in 1936, $4.37 in 1937, $2.23 in 1938, and 95 cents in 1939.

Based on the proposition that the sheeted pulp would have sold at a premium of $2 over shredded pulp, petitioner contends for a reconstruction of the Anacortes sales for 1936 and 1937 at a price $2 less than that at which it claims the Bellingham pulp was sold. A reconstruction of the Anacortes production costs for 1936 and 1937 is claimed only to the extent which would result where the fixed charges would not have been increased by reason of the claimed capacity production of 28,000 tons per year over the tonnage actually produced.

The primary difficulty with the reconstruction contended for by petitioner is that the evidence does not, in our opinion, support the basic figures used in the computation. In the first place, we have found on the evidence that the capacity for the Bellingham mill at December 31, 1939, was not in excess of 92,750 tons per year. In the second place, taking into account the facts relating to the production and sale of pulp during the base period, we find no justification for the conclusion stated by petitioner's witnesses that it would have produced, and would or could have sold, 100,000 tons of pulp from the said mill per base period year, even if it had such capacity. Conclusions to that effect were stated intermittently by petitioner's witnesses, but the evidence convincingly indicates that they were conclusions and in stating them other evidence, including parts of the witnesses'

own testimony, did not support the conclusions stated. It is true that in late 1936 and early 1937 there was no difficulty whatever in obtaining orders, which, if they ripened into actual sales, would have kept petitioner's mill, and presumably other pulp mills, running for a great portion of both years at capacity. It is apparent from the record, however, that orders did not parallel sales, and the evidence plainly shows that the orders as they existed during the boom times when capacity production might have been anticipated were drastically adjusted downward and extended to cover greater periods of time, and in that connection, it may be observed that the advantage was with the foreign pulp producers and not the domestic. For no year during the base period did the production of the American pulp mills run at capacity.

With respect to selling prices, we have noted the conclusions stated both by witness Enders and by witness Roberg, of petitioner's own official family. We find nothing of evidence to justify the conclusion that petitioner's pulp in sheeted form from its new Bellingham mill would have sold at any such prices. Because of the involved condition of the record, due largely to the confused state of various joint exhibits submitted by stipulation, not only is it not possible to relate the evidence to the requested conclusions as to fair reconstructed selling prices for petitioner's sheeted pulp, but it is not possible to determine with any satisfaction just what price petitioner's pulp in sheeted form would have sold at during the base period. More persuasive than anything else, however, is evidence to the effect that the sheeted pulp would have sold at $2 per ton higher than shredded pulp of the same quality, and we find nothing in the evidence which would justify a conclusion that, aside from the fact that the one was in sheeted form and the other shredded and for that reason cleaner and easier to handle and process, the pulp from the new mill was any better in quality than the pulp from the old. Thus, we find no basis for concluding that the pulp from the new mill, which would have been produced instead of the shredded pulp actually produced, would have sold at a price which would have exceeded by more than $2 per ton the price at which the shredded pulp was sold. In fact, if the prices received on petitioner's 1937 domestic sales of Anacortes pulp are considered, the Anacortes pulp may well have been a substantially superior product as shredded pulp, than the Bellingham sheeted pulp was as sheeted pulp.

There can be no question that the new mill at Bellingham was more efficient and a more effective producer of pulp than the old mill. It is also true that its cost of producing pulp was comparatively less than the cost of production by the old mill. The evidence will not support, however, the margins of differences in costs used by petitioner in the reconstruction for which it contends. Most of the evidence on

the matter of costs is to be found in the testimony of Ekholm, the plant superintendent, which testimony was based, to some extent, on figures contained in the exhibits of record. Some of his conclusions we have been unable to relate to any evidence. As in the case of the price at which the petitioner's sheeted pulp would have sold, if the new mill had been in operation throughout the base period years, we are likewise unable to make any satisfactory determination as to the specific amounts by which the cost of producing pulp in the new mill would have been less than the actual costs in the manufacture of pulp by the old mill. For the purposes here, it is sufficient to refer to only two or three. Ekholm, in his reconstruction of costs as given in his testimony, took into account the savings in sulphur attributable to the $SO_2$ recovery system. The facts show that completion of the installation of that facility and the placing of it in operation did not take place until about April of 1940. It is accordingly not within the petitioner's claim for section 722 relief, and is not in issue in this case. In other instances, the savings were indicated solely by spreading certain costs over the assumed production of 100,000 tons per year, which assumed production we have rejected.

More far reaching, however, is our inability to determine log costs. There is no way of knowing what petitioner's actual log costs were, insofar as they relate to the pulp-producing operations, or what they would have been if the new Bellingham mill had been in operation throughout the base period. So far as appears, the losses actually sustained by the Clear Lake logging operation, and more, could have been from the pricing of logs as between the logging operation and the pulp mill. It was admitted, and was so stated by witnesses, that the pricing of logs was not based upon cost of producing them. There is in the testimony the stated conclusion that logs from the Clear Lake production were used only when the open market for logs was such as to indicate that it was cheaper to use the Clear Lake logs. Evidence along that point was never developed, and such evidence as is of record will not sustain it. As to the Clear Lake logs, Ekholm accepted the book figures, but whether they were close to or far from actual cost, he obviously did not know. We accordingly have no idea just how close the cost of the logs as entered on the petitioner's books as attributable to the pulp production represented actual costs, or what the difference would have been if the larger operation of the new Bellingham mill had started at January 1, 1936.

With respect to actual production, and aside from the stated conclusions of Enders and other witnesses of petitioner, there is no reason to assume or conclude that the new Bellingham mill, if it had been in operation at January 1, 1936, would have operated at a much, if at any, greater percentage of capacity than was actually done

by all nonintegrated mills producing unbleached sulphite pulp, all of which were on the Pacific coast. Further, we have found no basis in the evidence for concluding that petitioner could have ratably sold more pulp than the other mills which were already established in the production of sheeted pulp during the base period did sell.

With respect to 1939, we see no cause for any reconstruction of the Bellingham mill operations. The mill had been completed for more than 6 months prior to January 1, 1939, and had been in actual operation something like 4½ months, and Bulkley Dunton had been seeking orders at least as early as May of 1938. We find no convincing or persuasive evidence that it did not produce and sell the full amount of pulp throughout the year 1939 which it would reasonably and normally have been expected to produce and sell if it had been in existence at January 1, 1936. According to Enders' own testimony, the sale of pulp was not easy in the early part of 1939. Furthermore, it is inescapable, from the evidence, that the higher production and sales during the latter part of 1939, particularly for the last 3 months, were due in substantial degree to the breaking out of the war in Europe. It was not a normal operation.

With respect to 1938, the situation is not so clear. It is true that neither the old nor the new Bellingham mill was in operation for a period of approximately 2½ months, but the facts show, on the other hand, that it was extremely difficult to sell pulp at all in the early months of the year. Conceivably, with the existence of the new mill from January 1, 1936, and of such market for its product as could have been established during 1936 and 1937, it would have operated to some extent more than the old mill actually was in operation, and that some adjustment by way of reconstruction should be made for 1938. We find no adequate support, however, for any conclusion that such additional production, if any, would have been in any really substantial amount.

With respect to the Anacortes mill, it is our conclusion and we hold that no reconstruction for any base period year is justified by the evidence.

In summary, the evidence does indicate, and with definiteness, that the existence and operation of a mill such as the Bellingham mill was at December 31, 1939, would have produced for petitioner an increased average base period net income over actual base period net income; that this would have been particularly true for the years 1936 and 1937, and possibly to some small degree for 1938, but that such increase definitely would not be sufficient to provide an excess profits credit which would exceed the excess profits credits based on invested capital and computed without benefit of section 722, of $616,471.36 for 1940, $619,152.70 for 1941 and $658,951.18 for 1942.

We are also of the opinion and on the evidence conclude and hold that the result here is not otherwise if all orders for delivery of pulp to Chinese customers in 1937 and 1938 be regarded as consummated sales of such pulp and all of the profits which could reasonably have been expected from such sales are taken in account. Of the orders received by petitioner for the delivery of pulp to Chinese customers during the base period, orders for 3,812 tons for delivery in 1937 and 2,688 tons for delivery in 1938 were canceled, due to war conditions existing in China during those years. And according to the orders, the gross selling price for such tonnage of pulp would have been $384,-690.36. Assuming the consummation of the sale of the pulp covered by such canceled orders at the ordered prices, the amount which would have represented the profit on such additional gross sales, when added to the actual profits realized by petitioner during the base period, plus constructive additional profits on account of the new Bellingham mill, would still not be sufficient to provide an excess profits credit which would exceed the excess profits credit based on invested capital and computed without the benefit of section 722.

The respondent's rejection of petitioner's claim for section 722 relief is sustained.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*